CARROLL L. DEELY AND WILDA DEELY, PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 9564–77.    Filed March 12, 1980.

---

*Roy J. True* and *William F. Pyne*, for the petitioners.
*Raymond L. Collins*, for the respondent.

DRENNEN, *Judge:* Respondent determined the following deficiencies in petitioners' income taxes:

| Year | Deficiency | Year | Deficiency |
|------|-----------|------|-----------|
| 1968...... | [1]$41,445.00 | 1973......... | $4,620.96 |
| 1972...... | 308.52 | 1974......... | 4,815.84 |

Due to concessions, the issues remaining for our resolution are as follows:

(1) Whether debts owing to petitioner from two corporations and becoming worthless in 1971 and 1973 are to be characterized as business bad debts under section 166(a), I.R.C. 1954,[2] or nonbusiness bad debts under 166(d);

(2) If we determine that the debts are properly characterized under section 166(a), is the debt owing by one corporation properly characterized as a contribution to capital;

(3) Whether the subsequent recovery of a previously deducted bad debt is properly characterized as ordinary income or short-term capital gain;

(4) Whether petitioner is entitled to certain deductions under section 162;

(5) As an alternative to (4), whether petitioner is entitled to certain deductions under section 212; and

(6) Whether certain deductions relating to travel and entertainment were substantiated in accordance with section 274(d).

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, is incorporated herein by reference.

Petitioners Carroll L. and Wilda Deely were husband and wife at all times material to this proceeding and resided in Dallas, Tex., at the time of the filing of the petition in this case. Petitioners jointly filed their income tax returns for the taxable

---

[1]The deficiency for 1968 is the result of a tentative allowance of a net operating loss carryback for the year 1971. While no deficiency was determined by respondent for 1971, respondent made various adjustments to petitioners' income and deductions claimed for 1971 which reduced petitioners' net operating loss carryback for 1971 to 1968. Consequently, the adjustments from 1971 must be determined in this proceeding.

[2]All section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in issue, unless otherwise specified.

years 1968, 1969, 1970, 1971, 1972, 1973, and 1974 with the Director, Internal Revenue Service Center, Austin, Tex. Wilda is a party to these proceedings by virtue of having filed a joint return. When we hereinafter refer to petitioner, we will be referring solely to Carroll.

## Bad Debt Deduction

Petitioner, at an early age, obtained employment in the oil fields of Kansas. After obtaining a "rather broad experience in the oil fields," petitioner became a drilling supervisor for a company called Western Geophysical. Around 1936, petitioner changed companies and was transferred by his new company, National Geophysical, to Dallas, Tex. Petitioner's job for National Geophysical was to open and manage a machine shop which included such equipment as lathes, milling machines, welders, and various other assorted equipment necessary to build oil and gas drilling equipment. By 1944, petitioner had terminated his employment with National Geophysical.

In 1937, while still employed by National Geophysical, petitioner and another employee formed a partnership, Griffin Tank & Welding, to engage in the business of welding tanks to be used in the oil business. Petitioner maintained his interest in this partnership at least until 1976.

After terminating his employment with National Geophysical in 1944, petitioner and three other friends created a partnership named Drilling & Service, Ltd. Petitioner conveyed to the partnership for use in its business a drilling unit that he had personally designed. In 1948, the partnership was dissolved and the partners organized a corporation named Drilling & Service, Inc. Petitioner contributed to the corporation the same drilling designs that had been used by the partnership and additionally turned over a patent he had obtained on a diamond drill bit. Petitioner maintained his interest in the corporation until 1961.

Between 1944 and 1971, petitioner became financially involved in at least 28 other enterprises.[3] In most of these enterprises,

---

[3]Although there is mention of at least 30 business entities in the record, petitioner has supplied us with only partially detailed records of only 26 entities, which are summarized as follows:

| | | Approximate time held (years) | Taxable income[1] | Gain or loss on sale |
|---|---|---|---|---|
| 1. | Griffin Tank | 39 | yes | Gain |
| 2. | Drilling & Service, Ltd.[2] | | | |
| | Drilling & Service, Inc.[2] | 16 | yes | Gain |

petitioner became involved in the initial organization phase. Of these enterprises, nine were operated in corporate form, while the others were either operated as partnerships or joint ventures. These entities were quite diversified in their fields of operation, which included: Automobile leasing, exploration and drilling for oil and gas, exploration for strategic minerals, owning and operating an art gallery, leasing real property, operating a computer company, and matching by computer buyers and sellers of corporations. Included among these entities were Mustang Applied Science Corp. (later known as Mustang Computing Co.), and Corporate Information Exchange, Inc., whose existences are material in this dispute, *infra*.

In addition to contributing part of the initial capital to these various business entities, petitioner also contributed valuable services and expertise gained by him in the oil exploration and drilling business. Additionally, petitioner assisted many of these

| | | | | |
|---|---|---|---|---|
| 3. | Shot Point, Inc. | 2 | yes | Gain |
| 4. | D&S Co. | 25 | yes | Gain |
| 5. | Deely & Jackson I | 4 | yes | (Loss) |
| 6. | Deely & Jackson II | 14 | yes | [3] |
| 7. | T&K Oil & Walters | 13 | yes | (Loss) |
| 8. | Deely & Alcock | 2 | yes | (Loss) |
| 9. | Deely & Coyle | [4] | [4] | [4] |
| 10. | Deely-Snebold | 17 | yes | Gain |
| 11. | Deely-Ultraoil Co. | 6 | yes | (Loss) |
| 12. | Deely-Star | 14 | yes | (Loss) |
| 13. | Deely Laantey | 4 | yes | [3] |
| 14. | Texas Mercury Co. | 5 | no | (Loss) |
| 15. | Texas Trading Assoc. | less than 1 | no | (Loss) |
| 16. | Mustang Applied Science Corp. | 4 | no | (Loss) |
| 17. | Padre Associates | 6 | yes | Gain |
| 18. | Phillips Galleries, Inc. | 6 | yes | 0 |
| 19. | Teletone, Inc. | 5 | no | (Loss) |
| 20. | Deely-Snebold | 5 | no | 0 |
| 21. | Deely Chapel | 6 mos. | no | 0 |
| 22. | Corporate Information Exchange, Inc. | 1 | no | 0 |
| 23. | Deely-Snebold | [4] | [4] | [4] |
| 24. | Strategic Minerals, Inc. | [4] | no | [4] |
| 25. | Stanley | [4] | yes | Gain |
| 26. | Idria-Deely | [4] | yes | Gain |

[1]This column reflects whether any taxable income in the form of dividends, salary, or bonus was derived by petitioner from these entities.

[2]We have combined Drilling & Service, Ltd., with Drilling & Service, Inc., since the corporation was just a continuation of the partnerships' business.

[3]This entity was sold in a nontaxable exchange.

[4]No evidence was submitted relating to this fact.

entities in obtaining financing by making direct loans to them or by personally guaranteeing the promissory notes of these enterprises. Some, but not all, of these business entities compensated petitioner in the form of salary and bonuses for his services.

Petitioner had different financial motives for investing in these enterprises. In some, he worked for a salary and for current income from dividends, while in others, from which he received neither salary nor current distributions of earnings, petitioner's stated purpose was to build these enterprises up for eventual resale.

Petitioner has maintained his interests in the entities for varying amounts of time. In one, he held his interest for 39 years, while he has sold others in approximately 2 years.

Petitioner's total investment in the 26 entities was $772,420. Additionally, between 1937 and 1976, petitioner made 10 loans to these entities in the total amount of $2,252,320. The ratio of the amounts loaned to amounts invested by petitioner was 2.91 to 1.

Petitioner has received and reported as ordinary income a total of $3,093,450 from the 26 business enterprises. Of this figure, a total of $2,746,937 was received by petitioner from six enterprises[4] as dividends, salaries, or bonuses. This $3,093,450 represents a 400.5-percent return on petitioner's initial investment.

Petitioner never sold stock or partnership interests in any of the entities in which he was financially involved. When a sale was negotiated, it was accomplished by selling the assets of the business and petitioner's profit or loss was realized on liquidation of the entity. Petitioner has reported as long-term capital gain a total of $1,172,066 from these transactions; his net long-term capital gain on these sales was $554,814, which represents a 71.8-percent return on investment.

In addition to enterprises in which petitioner has extensive involvement, petitioner has a history of extensive investments in companies in which he has no direct involvement. He was simply a passive investor in these latter companies and he did not contribute his time, talent, initiative, expertise, or credit to such enterprises. An examination of petitioner's returns for the years

---

[4]Griffin Tank; Drilling & Service, Inc.; D&S Co.; T&K Oil; Deely-Snebold; and Deely-Star.

in issue reveals that petitioner liquidated part or all of his passive investment in stock or securities in 59 different companies in 1968; 57 in 1969; 22 in 1970; 24 in 1971; 5 in 1972; 4 in 1973; 6 in 1974; and as a result of such liquidations, petitioner reported significant capital gains and losses.

In 1967, the concept of entering into the computer business was brought to petitioner's attention. After giving this some thought, petitioner and others organized Mustang Applied Science Corp. (Mustang), a Texas corporation. Petitioner approached this endeavor with a dual purpose—to draw a salary and also to make the corporation a viable entity that would be attractive for a merger and for eventual sale to the public. In this regard, all of petitioner's time was spent screening candidates for a possible merger. He did not become involved in the day-to-day operations of the business, and he never drew a salary from Mustang.

Petitioner arranged a $200,000 line of credit for Mustang with his personal bank, Mercantile National Bank, at Dallas. Pursuant to this line of credit, Mustang subsequently borrowed $180,000 from the Mercantile National Bank, signing one note for $165,000 and one note for $15,000. Petitioner signed as a guarantor on both of these notes. Mustang paid all but $35,715 of the $180,000 aggregate amount of the loans.[5]

Petitioner also made an original capital contribution of $25,000 to Mustang and received in exchange therefor 25,000 shares of stock. Additionally, petitioner loaned $265,000 to Mustang, the debt being evidenced by convertible debenture notes which petitioner eventually converted into an additional 265,000 shares of stock.

Between November 1970 and March 1971, petitioner loaned to Mustang a total of $63,750. These loans were evidenced by promissory notes which were secured by an assignment and mortgage of certain accounts receivable identified in the promissory notes.

Mustang became insolvent in 1971. At that time, the corporate charter was revoked for nonpayment of the corporate franchise tax. At the time of its insolvency, Mustang was indebted to

---

[5]It is unclear from the stipulation whether the unpaid balance of the loans was $35,715 or $37,715. However, because it is clear that petitioner only paid $35,715 on these loans and because there is no evidence that petitioner did not pay the entire outstanding balance, we have found that the outstanding balance was $35,715.

petitioner in the amount of $18,067 on the loans secured by the accounts receivable. Additionally, petitioner, pursuant to his guarantee, paid the Mercantile National Bank $35,715, this being the unpaid balance on the loans advanced by the bank to Mustang. These debts totaling $53,782 became totally worthless in 1971, the year of Mustang's insolvency. On his 1971 income tax return, petitioner claimed this amount as a business bad debt. Petitioner also reported $290,200 as a long-term capital loss from Mustang on his 1971 return.

In 1973, a debtor of Mustang paid on its open account the amount of $4,500, which amount was received and reported by petitioner on his 1973 return as ordinary income.

In 1971, petitioner became involved in the organization of Corporate Information Exchange, Inc. (CIE). CIE was formed to act as a broker for buying and selling corporations. The concept was to computerize the characteristics and financial information of corporations wishing to buy, sell, or merge and then pair up candidates for a possible sale or merger. Although a corporate charter was obtained, no stock was ever issued by CIE and there were no contributions to its capital as such. Between April 1971 and April 1973, petitioner loaned a total of $41,274 to CIE, this amount being evidenced by promissory notes. Petitioner did not receive these notes until after CIE had failed. These amounts were used by CIE as operating funds. In 1973, the original concept and the corporation were abandoned, and petitioner's debt became totally worthless in that year. The resulting loss of $41,274 was claimed on his 1973 income tax return as a business bad debt.

Larry Ferguson (Ferguson), a certified public accountant, performed accounting work for petitioner between 1947 and 1972. Petitioners' returns for 1968 through 1972 were either prepared personally by Ferguson or under his personal supervision. It was not claimed on any income tax return for 1968–72 that petitioner was in the trade or business of promoting or selling corporations or business entities. On the returns for 1968 and 1969, petitioner's occupation was stated as "oil operator, investor & inventor," on the 1970, 1971, and 1972 returns, as "investments," and on the 1973 and 1974 income tax returns, which returns petitioner personally prepared, as "investments, loans, etc."

When petitioners' 1971 income tax return was under examina-

tion, Ferguson submitted a letter to the Internal Revenue Service stating that petitioner was in the business of (1) lending money and (2) being an employee. No mention was made that petitioner was in the business of dealing in corporations.

Respondent has determined that the admittedly worthless debts owing from Mustang and CIE for the years 1971 and 1973, respectively, are nonbusiness bad debts whose treatment is governed by section 166(d). Respondent's position is based on his determination that petitioner was not engaged in any trade or business during the taxable years to which these debts were proximately related.

## Business Deductions

During the tax years in issue, petitioner claimed various deductions under section 162 as expenses incurred in his various financial dealings. On audit, respondent allowed petitioner to deduct some of the expenses claimed as Schedule E, rent and royalty expenses, or as itemized deductions.

The following are the claimed section 162 deductions which respondent has disallowed:

|  | Amounts | | | |
|---|---|---|---|---|
| Items | 1971 | 1972 | 1973 | 1974 |
| Rent | [6]$872 | $2,432 | $1,800 | $1,800 |
| Depreciation | 2,691 | 879 | 849 | 255 |
| Legal and professional fees[7] | 280 | --- | 2,908 | 3,117 |
| Telephone | 301 | 597 | 421 | 431 |
| Telephone answering service | --- | 300 | --- | --- |
| Automotive | 795 | 1,008 | 1,318 | 1,273 |
| Small tools and office supplies | 228 | 121 | 249 | 263 |
| Entertainment and transportation | 4,865 | 7,542 | 3,987 | 4,019 |
| Miscellaneous | --- | [8]167 | --- | --- |
| Production expenses | --- | --- | 89 | --- |

Additionally, petitioner claimed a deduction for insurance premiums for each of the taxable years in issue. These premiums, however, related to insurance on petitioner's personal

---

[6]At trial, petitioner testified that $800 of the claimed expense related to rent, and $72 related to supplies.

[7]On audit, respondent had previously allowed, as itemized deductions, $825 for legal and professional fees for the tax years 1973 and 1974.

[8]Respondent has previously allowed, as an itemized deduction, $205 for miscellaneous expenses.

residence and, therefore, represent a nondeductible personal expense.

Between 1968 and 1972, petitioner rented a two-room office from a corporation owned by Ferguson. The stated rent was $200 per month. Petitioner used this office to review business opportunities presented to him by various individuals. He also used the office to conduct meetings with various prospective investors.

Each of the business enterprises in which petitioner held an interest maintained its own separate office and none of these enterprises operated from petitioner's office. The $200-a-month rental expense was not charged to any other entity in which petitioner held an economic interest.

Additionally, petitioner had a telephone installed in this office and engaged an answering service to answer his phone while he was away. The telephone number was listed in petitioner's own name and was not shared by anyone else.

Although petitioner occupied this office for the tax year 1971, he neglected to claim any amount paid to Ferguson's corporations as a rental expense. The rental expense claimed for 1971 relates to rent on laboratory equipment located in petitioner's home. Petitioner used this equipment to aid in the creation of inventions, although petitioner is not in the business of being an inventor.

The claimed rent deduction for 1972 was for rent paid to Ferguson's corporation. No explanation was offered for the $32 amount in excess of the yearly rental of $2,400.

The rental deductions for 1973 and 1974 were claimed for an office and laboratory expenses located in petitioner's home. No amount was claimed for rent paid to Ferguson's corporation.

The depreciation deduction for 1973 relates to lathes and milling machines located in petitioner's laboratory and to an automobile. No evidence was presented as to the source of the depreciation deductions for the 1971, 1972, and 1974 taxable years.

Respondent's disallowance was based on the following premises: (1) The expenses were not incurred in a trade or business and, therefore, are not deductible under section 162, (2) the expenses incurred were in actuality those of businesses in which petitioner held an interest and, thus, are not deductible by petitioner; (3) the expenses were not incurred for the purposes

designated; and (4) the claimed travel and entertainment expenses were not substantiated in accordance with the provisions of section 274(d). Respondent does not dispute that these amounts were in fact expended.

Petitioner disputes the above determinations, and by amended petition, he alternatively contends that the expenses incurred were ordinary and necessary for the production or collection of income and, therefore, are deductible under section 212.

## OPINION

### Bad Debt Deduction

Since 1937, petitioner has been involved in the initial organization of at least 26 business enterprises doing business in various fields. In 1967 petitioner, with other investors, organized Mustang, a Texas corporation. The organizers envisioned the creation of a computer business into which numerous other businesses could be merged, thereby creating a large corporation whose stock would be salable to the public. Petitioner initially made a capital contribution of $25,000; however, by 1971, his equity investment in Mustang had increased to $290,000.

In addition to his initial investment, petitioner guaranteed certain loans (totaling $180,000) made to Mustang by third parties, and he personally loaned Mustang $63,750, such loans being secured by certain accounts receivable of Mustang.

In 1971, Mustang became defunct, and petitioner paid the balance of $35,715 due on the $180,000 loan. Moreover, petitioner was unable to collect $18,067 of the original $63,750 that he personally loaned to Mustang. On his 1971 income tax return, petitioner claimed both these amounts as a business bad debt deduction.

In May 1971, petitioner and others organized CIE. Although a corporate charter was obtained, no stock was ever issued by CIE, nor were any capital contributions ever made. As part of the financing of this venture, petitioner loaned to CIE amounts totaling $41,274, which was used by the company as operating capital. Following the abandonment in 1973 of CIE as a business, petitioner claimed on his 1973 return a business bad debt deduction of $41,274, the amount which petitioner was unable to recover from CIE.

Initially, there is no dispute as to the amounts advanced by

petitioner to Mustang and CIE, nor is there any assertion that these debts did not become worthless in the years claimed. It is respondent's contention that these amounts are more properly characterized as nonbusiness bad debts within the meaning of section 166(d) because petitioner had no trade or business in which to incur these debts.[9]

Petitioner asserts that his activities since 1937 show that he is in the business of "promoting, organizing, financing and/or dealing in corporations." He argues that his loans to Mustang and CIE were proximately related to that business and, therefore, the losses resulting from their worthlessness were properly characterized as business bad debts under sections 166(a)(1) and 166(d)(2)(A) and (B).

Section 166[10] provides generally for the tax treatment of worthless debts. Section 166(a)(1) allows as a deduction from ordinary income the full amount of any debt which becomes worthless during the taxable year. Section 166(d) renders the aforementioned provision inapplicable to debts characterized as nonbusiness bad debts. Section 166(d)(2) defines a nonbusiness bad debt as any debt other than (1) "a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer"; or (2) "a debt the loss from the worthlessness of

---

[9]Moreover, respondent asserts that if we find that these admittedly worthless debts are in fact business bad debts, then respondent alternatively argues that the loans made by petitioner to CIE were not bona fide debts arising from a debtor-creditor relationship, but were in fact contributions to the capital of CIE and, hence, not deductible under sec. 166. In view of our resolution of respondent's primary argument, we will neither consider nor comment on the propriety of this alternative argument.

[10]Sec. 166 provides in part:

SEC. 166. BAD DEBTS.

(a) GENERAL RULE.—

(1) WHOLLY WORTHLESS DEBTS.—There shall be allowed as a deduction any debt which becomes worthless within the taxable year.

\*    \*    \*    \*    \*    \*    \*

(d) NONBUSINESS DEBTS.—

(1) GENERAL RULE.—In the case of a taxpayer other than a corporation—

(A) subsection (a) and (c) shall not apply to any nonbusiness debt; and

(B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months.

(2) NONBUSINESS DEBT DEFINED.—For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than—

(A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or

(B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.

which is incurred in the taxpayer's trade or business." To be characterized as a business bad debt, it is not enough that the debt is related in some general way to the taxpayer's trade or business. Only if the debt bears a proximate relation to the taxpayer's trade or business will it qualify as a business bad debt. Otherwise, the debt will be classified as a nonbusiness bad debt. Sec. 1.166–5(b), Income Tax Regs.; *United States v. Byck*, 325 F.2d 551 (5th Cir. 1963).

The crucial part in the definition of nonbusiness bad debts are the words, "trade or business." For a taxpayer to prevail in his claim for a business bad debt deduction it is essential for him to show that he had a business to which the debt is proximately related. *Townshend v. United States*, 181 Ct. Cl. 635, 384 F.2d 1008, 1011 (1967). The question of whether a debt is incurred in a trade or business is a question of fact, *Higgins v. Commissioner*, 312 U.S. 212 (1941); *Giblin v. Commissioner*, 227 F.2d 692 (5th Cir. 1955), on which petitioner bears the burden of proof. Rule 142(a), Tax Court Rules of Practice and Procedure.

It has been recognized that a worthless bad debt resulting from a loan by a shareholder to a corporation may qualify as a business bad debt if the shareholder was engaged in the trade or business of promoting, organizing, financing, and selling businesses. *Giblin v. Commissioner, supra;* cf. *Whipple v. Commissioner*, 373 U.S. 193 (1963). It is also equally clear that if the shareholder is only an investor, this same debt will be classified as a nonbusiness bad debt, for management of one's investments, no matter how extensive, does not constitute a trade or business. *Higgins v. Commissioner, supra.*

The leading case in this area is *Whipple v. Commissioner, supra.* The taxpayer in *Whipple* had been involved in no fewer than 15 business ventures. He had made loans to one corporation in which he was a substantial shareholder and for which he also performed services. The Supreme Court, in characterizing these loans as nonbusiness bad debts, stated:

Devoting one's time and energies to the affairs of a corporation is not of itself, and without more, a trade or business of the person so engaged. Though such activities may produce income, profit or gain in the form of dividends or enhancement of the value of an investment, this return is distinctive to the process of investing and is generated by the successful operation of the corporation's business, as distinguished from the trade or business of the taxpayer * * * [373 U.S. at 202.]

We believe that this language from *Whipple* is also dispositive of the facts before us. While the Court recognized that there may be situations where the officer/shareholder may be able to establish a trade or business separate from that of his corporation, we do not find these facts here.

In order to establish a business separate from that of his corporations, petitioner must show that the compensation he seeks from his activities is other than the normal investor's return and that income received is directly for his services rather than indirectly through the successful operation of the corporate enterprise. *Whipple v. Commissioner, supra* at 203.

Petitioner contends that he was in the separate business of promoting, organizing, financing, and/or dealing in corporations. It seems clear from *Whipple* that to qualify such activities as a separate business they must be conducted for a fee or commission or with the immediate purpose of selling the corporations at a profit in the ordinary course of that business. See also *Bodzy v. Commissioner*, 321 F.2d 331 (5th Cir. 1963); *United States v. Byck, supra; Millsap v. Commissioner*, 46 T.C. 751 (1966), affd. 387 F.2d 420 (8th Cir. 1968). There is no evidence in this case that petitioner received any fees or commissions for organizing, financing, or promotional activities; instead, he usually invested or took an equity interest in the entities that he organized, promoted, or financed. Petitioner contends, however, that he is in the business of developing business enterprises for eventual resale at a profit. In support of his position, petitioner relies on *Giblin v. Commissioner, supra.*[11]

To fall within the rule established in *Giblin*, petitioner must show that the entities were organized with a view to a quick and profitable sale after each business had become established, rather than with a view to long-range investment gains. Cf. *Giblin v. Commissioner, supra; Bodzy v. Commissioner, supra; United States v. Byck, supra; Townshend v. United States, supra.*

It is the early resale which makes the profits income received directly for services, for the longer an interest is held, the more profit becomes attributable to the successful operation of the

---

[11]Although cited in the Supreme Court opinion in *Whipple v. Commissioner*, 373 U.S. 202, 203 (1963), it would appear that *Giblin v. Commissioner*, 227 F.2d 692 (5th Cir. 1955), has been sapped of some of its vitality by the opinions of the Fifth Circuit in *Bodzy v. Commissioner*, 321 F.2d 331 (5th Cir. 1963); and *United States v. Byck*, 325 F.2d 551 (5th Cir. 1963). Other cases relied on by petitioner, such as *Commissioner v. Stokes Estate*, 200 F.2d 637 (3d Cir. 1953), and *Sage v. Commissioner*, 15 T.C. 299 (1950), were also decided before *Whipple v. Commissioner, supra.*

corporate business. *Millsap v. Commissioner, supra* at 757. There can be no "blending of the corporation's business with that of the shareholders." *Deputy v. DuPont,* 308 U.S. 488, 494 (1940); *Whipple v. Commissioner, supra.*

Petitioner, in an effort to comport with the above standard, has testified that his purpose and intent in organizing these various entities was to build them up for the purpose of resale at a profit. The facts, however, do not support this intention.

Evidence was offered regarding 26 entities. Of the 26 entities in which petitioner maintained a financial interest, 16 entities were at least marginally profitable in the sense that petitioner derived income from them in the form of dividends, salaries, or bonuses. It is upon these entities that we will focus. We will disregard the 11 entities from which petitioner realized no income and which he sold at a loss or abandoned. The fact that these entities were, for the most part, quickly sold or abandoned in no way helps in resolving the question of whether the petitioner was a business developer or an investor because in either event it is only natural that he would quickly dispose of losing propositions.

With regard to the 16 profitable entities, we can determine the length of time that petitioner maintained an interest in 14[12] of them. Seven[13] of these 14 entities were held for periods longer than 13 years. Although the remaining 7 entities[14] were held for periods of less than 6 years, the evidence indicates that only 1[15] of these entities was sold at a profit.

Additionally, petitioner has sold eight entities at a profit. We can determine the length of time petitioner held an interest in six of these entities. Four of the six entities sold at a profit were held by petitioner for periods ranging between 17 and 39 years.[16]

Contrary to petitioner's assertions, it is apparent that the pattern of actions shows an initial intent to hold onto the

[12]Griffin Tank; Drilling & Services; Shot Point; D&S Co.; Deely & Jackson I & II; T&K Oil & Walters; Deely & Alcock; Deely-Snebold; Deely-Ultraoil; Deely-Star; Deely Laantey; Padre Associates; and Phillips Galleries.

[13]Griffin Tank; Drilling & Services, Inc.; D&S Co.; Deely & Jackson II; T&K Oil; Deely-Snebold; and Deely-Star.

[14]Shot Point; Deely & Jackson I; Deely & Alcock; Deely-Ultraoil; Deely Laantey; Padre Associates; and Phillips Galleries.

[15]Shot Point. Another entity, Deely Laantey, was sold within 6 years in a nontaxable exchange, but we are unable to determine if the sale was at a profit or loss.

[16]Griffin Tank; Drilling & Services; D&S Co.; and Deely-Snebold.

profitable ventures, while relinquishing his interest only in the losing ventures.[17] The length of time petitioner has held these profitable entities is fatal to his claim that the circumstances were so "exceptional" as to constitute a trade or business separate and distinct from the business of the entities. *Berwind v. Commissioner*, 20 T.C. 808 (1953), affd. 211 F.2d 575 (3d Cir. 1954); *Rollins v. Commissioner*, 32 T.C. 604, 616 (1959), affd. 276 F.2d 368 (4th Cir. 1960).

Furthermore, we cannot overlook the fact that petitioner did not view himself as a dealer in corporations. Whenever petitioner terminated his interest in these entities, he always reported the proceeds as long-term capital gain or loss. In fact, on his 1971 return, petitioner reported a long-term capital loss of $290,200 from Mustang, whose unpaid obligations are the basis for petitioner's claimed deduction for business bad debts in that same year. While this is by no means fatal to his claim to being a dealer in corporations, this fact strongly suggests that he viewed himself as an investor rather than a dealer. Cf. *Rollins v. Commissioner, supra* at 616; *Millsap v. Commissioner, supra* at 757. Additionally, on his income tax returns for the years in issue, petitioner listed one of his occupations as being "investor" or "investments." Furthermore, on audit, petitioner took the position that he was in the business of being an employee[18] or in the business of lending money. No mention was made that he considered himself a dealer in business entities. It is clear to us that petitioner did not possess the requisite view to an early and profitable resale. *Townshend v. United States, supra.*

We are additionally unimpressed with petitioner's argument that he is in the business of promoting, organizing, and managing these enterprises. Firstly, "devoting one's time and energies to the affairs of a corporation" is not a trade or

---

[17]There is some evidence in the record which suggests that petitioner intended to develop Mustang for an early and profitable sale, but it is not clear from his testimony whether petitioner was thinking of selling the corporation or simply selling stock of the corporation for additional capital. This is the only evidence other than petitioner's own testimony as to his initial intent upon organizing the entities. In view of the length of time petitioner had held his interests in his other ventures, this evidence does not equate with substantial additional evidence "to show that petitioner was in the business of developing corporations for sale to customers in the ordinary course." *Whipple v. Commissioner, supra* at 203.

[18]We recognize that worthless debts are deductible as business bad debts when loans made are to an employer-corporation for the dominant purpose of protecting one's status as an employee. *United States v. Generes*, 405 U.S. 93 (1972). Petitioner has not made this argument, however, and we do not consider it.

business. *Whipple v. Commissioner, supra.* Secondly, although petitioner was clearly an organizer and promoter in the traditional sense, in order for a promoter to be engaged in a trade or business for tax purposes he must do so for "compensation other than the normal investor's return." *Millsap v. Commissioner, supra* at 756.

The record does not indicate that petitioner ever received this type of compensation with respect to the entities that were formed. On his tax return for the years in issue, petitioner never reported such compensation as a fee or commission, nor does petitioner claim that any shares that he received from the corporations which he organized were received for promotional services. We, therefore, are unable to find that petitioner was in the trade or business of organizing and promoting business entities for a fee. Furthermore, although there is some evidence in the record that petitioner had a reputation in the community for promoting new ventures, the absence of any indication that petitioner was separately compensated for his efforts renders this evidence unpersuasive. See *United States v. Byck, supra.*

Finally, petitioner claims that he was in the business of financing new ventures. The record indicates that during the period from 1937 to the date of trial, a period of over 30 years, petitioner made 10 loans to his business enterprises. The making of only 10 loans over such a long period, regardless of the amounts involved, hardly constitutes an activity so extensive or continuous as to constitute a separate trade or business. *Maloney v. Spencer,* 172 F.2d 638 (9th Cir. 1949).

For the above reasons, we conclude that the debts in issue were not proximately related to any trade or business of petitioner. Accordingly, they must be classified as nonbusiness bad debts and subjected to the treatment provided for under section 166(d).

## Recovery of Bad Debt

In 1973, subsequent to petitioner's claiming a business bad debt deduction with respect to Mustang, a debtor of Mustang paid on its open account the amount of $4,500. This amount was received and reported by petitioner on his 1973 income tax return as ordinary income. There is no dispute that this amount constitutes income pursuant to section 111. The controversy here revolves around the character of this amount. Petitioner con-

tends that he properly characterized this amount as ordinary income. Respondent argues that this recovery should be characterized as short-term capital gain. We agree with respondent.

Since we have decided that the proper treatment on the debt in the year of worthlessness is governed by section 166(d), and therefore deductible only as a short-term capital loss, it is well settled that the subsequent recovery must be included in income as short-term capital gain. *Arrowsmith v. Commissioner*, 344 U.S. 6 (1952).

## Business Deductions

Respondent takes the position that the deductions claimed are improper as petitioner has not shown he was in a trade or business during the taxable years in issue. He alternatively argues that even if the taxpayer was in a trade or business, (1) the expenses claimed were not proximately related to a trade or business of the taxpayer; (2) the expenses claimed were in fact the expenses of the business entities; (3) the expenses claimed were not for the purposes designated; and (4) the travel and entertainment expenses were not substantiated as required by section 274(d).[19] Respondent does not dispute that the amounts claimed were actually expended.

For the reasons previously stated, we agree with respondent's first contention that no deductions are allowable under section 162 as petitioner has not established that he was in any trade or business during the taxable years in issue. *Higgins v. Commissioner, supra.* This does not, however, mean that petitioner's expenses may not be deductible, for by amended petition, petitioner contends in the alternative that the expenses in question are deductible under section 212 as being expenses incurred for the production or collection of income.

The predecessor of section 212 was enacted as a response to the *Higgins* case, *supra,* in which the Supreme Court held that investing, no matter how extensive, does not qualify as a trade or business. This provision was enacted to give relief to taxpayers in the situation in which petitioner finds himself. See H. Rept. 2333, 77th Cong., 2d Sess. 46; S. Rept. 1631, 77th Cong., 2d Sess. 87. However, before petitioner is entitled to the benefits

---

[19]Respondent has not advanced sec. 274(a) as a theory for disallowance and we do not consider that possible argument.

of section 212, he must overcome two hurdles: Petitioner must show that the expenses claimed are indeed his and not those of a separate and distinct taxpayer *(Deputy v. DuPont, supra; Kaplan v. Commissioner,* 21 T.C. 134 (1953)), and the expenses claimed must be ordinary and necessary and bear a reasonable and proximate relation to the production or collection of income. Sec. 1.212–1(d), Income Tax Regs.; *Kinney v. Commissioner,* 66 T.C. 122 (1976).

The disallowance of the claimed deductions by respondent has the support of the presumption of correctness and petitioner bears the burden of showing his entitlement to the deductions claimed. *Welch v. Helvering,* 290 U.S. 111 (1933); *New Colonial Ice Co. v. Commissioner,* 292 U.S. 435 (1934); Rule 142(a), Tax Court Rules of Practice and Procedure.

With few exceptions, petitioner has not presented evidence to show error in respondent's determination. With respect to some items, no evidence whatsoever has been presented. We will discuss each category of deductions claimed, but except as specifically pointed out herein, respondent's determinations are sustained.

## Rent

During 1968 through 1972, petitioner rented a two-room office facility from the corporation owned by Ferguson, his accountant. Petitioner maintained a telephone and answering service at his office. Neither the office nor the telephone were shared by any of petitioner's other businesses. The rent charged was $200 a month.

Petitioner neglected to claim a deduction for any amount paid to Ferguson's corporation as rent for 1971. He makes no claim for a deduction for those expenses now, and we, therefore, do not decide his entitlement to one.

For the year 1972, petitioner testified that the office was used to conduct meetings with various investors and to review and organize his investment opportunities. Considering the size and frequency of his investments, it is readily apparent that rent paid for an office from which to review existing and future investments was an ordinary and necessary expense incurred for the management, conservation, or maintenance of investments held for the production of income. Sec. 1.212–1(g), Income Tax Regs.

Respondent argues that the only income reported by petitioner on the Schedule C of his return related to oil royalty income. He then reasons that these expenses are nondeductible as bearing no relation to this royalty income. There is no merit to this argument as there is a proximate relationship between these expenses and the production of taxable income; namely, gains from the sale of his investments and dividends. See sec. 1.212–1(b), Income Tax Regs.

Petitioner testified that he conducted no business of the entities in this office, nor did he share this space with any of these entities. This testimony was also corroborated by his accountant. We, therefore, find that these expenses were those of petitioner and not the expenses of any other taxpayer.

Although $2,432 was claimed as a rent deduction, the record indicates that only $2,400 was actually expended. We are unable to determine to what the other $32 related and, therefore, find that only $2,400 is deductible as rent for the tax year 1972.

The rent deductions claimed on the return for 1971 related to rent on laboratory equipment. The rent deductions claimed for 1973 and 1974 related to an office and laboratory located in petitioner's home.

As to the deductions relating to the laboratory and equipment, petitioner has not introduced evidence to enable us to link the expenses with the production of income. The same is true for the office expenses. Accordingly, we uphold respondent's determinations for 1971, 1973, and 1974.

### Depreciation

Petitioner claimed depreciation deductions of $2,691, $879, $849, and $255 for the tax years 1971 through 1974, respectively. Section 167(a)(2) provides a deduction for depreciation on property held for the production of income. The phrase "property held for production of income" as used in section 167(a)(2) means the same as it does in section 212. *Mitchell v. Commissioner*, 47 T.C. 120 (1966). Therefore, before property can be considered depreciable, the taxpayer must show some nexus between the property and the production of income.

The only evidence presented at trial relating to these deductions was for the year 1973. Petitioner stated that the depreciation taken in that year related to an automobile and certain lathing and milling equipment used in a laboratory located in his

home. Apparently he had expectations of producing patentable inventions from his laboratory, although this is by no means clear from the record. Petitioner makes no argument that he is an inventor, nor does he offer any evidence as to any income produced or expected to be produced from his inventions; therefore, we conclude that petitioner has failed to establish any nexus between the equipment depreciated and the production of income.

As to the automobile, petitioner offered no evidence as to its use. Here, also, we are left with no choice but to sustain respondent's determination.

As previously noted, concerning the tax years 1971, 1972, and 1974, the record is devoid of any facts to support petitioner's position. Accordingly, we sustain respondent's disallowance of depreciation for all tax years that are before us.

### Telephone and Answering Service

Petitioner claims deductions for telephone expenses in the following amounts: $301, $597, $421, and $431 for the tax years 1971 through 1974, respectively. Additionally, for the tax year 1972, petitioner claimed a deduction of $300 for expenses relating to a telephone answering service obtained by him.

For the tax years 1971 and 1972, the expenses relate to a telephone located in petitioner's rented office. We find that the expenses incurred in those years to be fully deductible under section 212 for the reasons stated in our discussion relating to rent. See sec. 1.212–1(g), Income Tax Regs.

As to the years 1973 and 1974, no direct evidence relating to these expenses has been offered. However, since petitioner's activities in these years were substantially the same as in the earlier years, we are satisfied that these expenses were for the production of income within the meaning of section 212. We also believe that these were petitioner's own expenses and not those of any other entity. Since respondent does not challenge the fact that the amounts claimed were actually expended, we find that the telephone expenses incurred in these years are also deductible under section 212.

### Legal and Professional Fees

Petitioner claimed deductions for legal and professional fees

for the tax years 1971, 1973, and 1974. Respondent has partially allowed deductions for the years 1973 and 1974. The only evidence in the record for these items is for the year 1973. Petitioner testified that expenses were incurred for patent searches and lawsuits. Petitioner's vague and undocumented assertions on this matter are not enough to overcome respondent's presumption of correctness, and we, therefore, uphold respondent's determination.[20]

### Entertainment and Transportation[21]

Petitioner deducted as travel and entertainment expenses $4,865, $7,542, $3,987, and $4,019 for the taxable years 1971 through 1974, respectively. Respondent has disallowed these deductions in their entirety.

The only evidence introduced at trial concerning these expenses was petitioner's own testimony that the entertainment expenses related to luncheon or golf games with employees or with actual or potential investors in petitioner's business ventures.

On the basis of the record, it is impossible to determine whether any of these expenses were ordinary and necessary and bore a proximate relationship to the production or collection of income. *Kinney v. Commissioner, supra.* Furthermore, even if we were to find that some of these expenses were properly deductible under section 212, section 274(d) prohibits this Court from making approximations of expenses of this type, based on the taxpayer's own testimony, which might otherwise be deductible under the rule of *Cohan v. Commissioner*, 39 F.2d 540 (2d Cir. 1930); sec. 1.274–5(a)(3), Income Tax Regs.

Section 274(d) provides that no deduction shall be allowed under section 212 for any travel or entertainment expense unless the taxpayer substantiates by adequate records the amount,

---

[20]Additionally, petitioner testified that the lawsuits involved suits by disgruntled employees of a corporation in which he owned an interest. If this be the case, it would appear to us that this was an expense of the corporation and not of petitioner. In any event, petitioner clearly has not proved respondent's determination erroneous.

Furthermore, even if petitioner had satisfied his burden as to the purpose of these expenditures, it further appears that the "origin of the claim" relates to assets that are capital and therefore sec. 263 would disallow the deductions. See sec. 1.212–1(k), Income Tax Regs.; *United States v. Gilmore*, 372 U.S. 39 (1963); *Woodward v. Commissioner*, 397 U.S. 572 (1970).

[21]Although petitioner has labeled these expenditures "transportation," from what we can adduce from the record, these transportation expenses were actually travel-away-from-home expenses and therefore subject to sec. 274.

date, place, business purpose, and business relationship of each and every expenditure claimed. "If such substantiation is lacking the deduction is to be disallowed entirely." *Dowell v. Commissioner*, 522 F.2d 708, 714 (5th Cir. 1975).

Petitioner testified at trial that he had supporting documentation consisting of either invoices that he paid, canceled checks, or personal notes that he made concerning each amount claimed. He further stated that these records were made available to the agent that audited his 1971 return, but that the agent did not examine these records carefully. Petitioner contends that this hasty inspection by the agent relieves him of compliance with section 274(d).

Without commenting on the propriety of this legal theory, we will simply state that we are not convinced that this is what in fact happened. Petitioner's returns were the subject of two separate audits, conducted by two different agents. Petitioner has made no objection to the manner in which the audits of his returns for 1972 through 1974 were conducted, his only objection relates to the audit of his 1971 return. Examination of the statutory notice of deficiency for each of the taxable years in issue shows that petitioner's travel and entertainment expenses were totally disallowed by each revenue agent for exactly the same reasons, namely, failure to substantiate as required by section 274(d). We assume that petitioner's method of keeping records remained the same for all tax years in issue. We infer from the fact that each agent reached the same conclusion, that the audit for 1971 was conducted in the same manner as was the subsequent audit.

Furthermore, petitioner's objection relates solely to 1971. At trial, no evidence whatsoever was introduced to substantiate these expenditures for any of the years in issue. We can only infer from this that the detailed records that petitioner claimed to have kept for those years were either inadequate or nonexistent. Petitioner has failed to convince us that this was not also the case for 1971.[22]

---

[22]While it is clear that petitioners have the burden of substantiating travel and entertainment expenses under sec. 274(d), as a matter of expediency and to avoid burdening the courts with the time-consuming task of sifting through multitudinous documents relative to such expenses (see *Dowell v. United States*, 522 F.2d 708 (5th Cir. 1975)), we urge respondent's agents, if lack of substantiation is to be used for disallowing claimed deductions of this nature, to carefully inspect the proof offered by taxpayers and cooperate with taxpayers in having such evidence presented to the Court in orderly fashion, whether respondent agrees that the proof meets the standard of the statute

Since adequate records substantiating petitioner's testimony were not introduced, we must disallow petitioner's deductions in full.

### Other Deductions

Petitioner also disputes respondent's disallowance of certain deductions claimed for automobile expenses, small tools, supplies, production expenses, and miscellaneous exenses. We have combed the record and have been unable to find any evidence offered by petitioner to overcome the presumed correctness of respondent's determination. We therefore sustain respondent's determination.

*Decision will be entered under Rule 155.*

---

or not. In this case, petitioner stated that the revenue agent who conducted the audit for 1971 did not seem to be interested in his documentatary evidence, so he saw no reason to produce it. We make no judgment on which action the agent took in this audit, but it is conceivable that an agent would initially determine that the claimed expenses are not deductible for reasons other than lack of substantiation and therefore eschew examination of the evidence proffered for substantiation. Of course, the taxpayer has the right to dispute the agent's initial determination, and this may create the dilemma faced by the trial judge in the case cited above.