# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-3241

_____

|  |  |  |
|---|---|---|
| Melvyn L. Bell, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | Tax Court. |
| | * | |
| Commissioner of Internal Revenue, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted:  September 15, 1999

Filed:  January 5, 2000

_____

Before RICHARD S. ARNOLD, FLOYD R. GIBSON, and LOKEN, Circuit Judges.

_____

LOKEN, Circuit Judge.

The Internal Revenue Code allows taxpayers to deduct "bad debts."  An individual taxpayer may deduct from ordinary income a *business* debt if it becomes totally or partially worthless during the tax year.  Any unused portion of that deduction increases the taxpayer's net operating losses that may be carried back to offset taxable income in earlier tax years.  However, an individual's *nonbusiness* bad debts are only recognized when they become totally worthless, and they are treated as short-term capital losses, which means they may offset no more than $3,000 of ordinary income and may not be carried back to prior tax years.  See 26 U.S.C. §§ 166(a), (d); 172(b),

(d)(4); 1211(b)(1); United States v. Generes, 405 U.S. 93, 95-96 (1972). A debt is a business debt if it is proximately related to a trade or business of the taxpayer. See 26 U.S.C. § 166(d)(2)(A); Treas. Reg. (26 C.F.R.) § 1.166-5(b).

In this case, for his 1988 tax year, Melvyn L. Bell deducted $5,360,636 of his outstanding loans to two corporations he owned, claiming the loans were partially worthless business debts. After carrying back the unused amount of this deduction to offset 1985 and 1986 income, Bell and his wife claimed and received $523,000 in tax refunds. The Commissioner of Internal Revenue subsequently denied this bad debt deduction and asserted substantial deficiencies in all three tax years. The Bells petitioned the Tax Court to redetermine these deficiencies. See 26 U.S.C. § 6213. After a trial, the Tax Court adopted one of the Commissioner's alternative theories and held that the bad debt deduction must be disallowed because the loans in question did not relate to Bell's trade or business. Bell appeals.[1] We affirm.

## I.

In 1973, Bell acquired a substantial equity interest in Environmental Systems Company ("ENSCO") and became its chairman and chief executive officer. In 1985, with his ENSCO stock worth more than $50,000,000, Bell decided to leave the company, pursue other business opportunities, and reduce his ENSCO holdings. Bell acquired ownership interests in and loaned money to a variety of other businesses, including Bell Equities, Inc. ("BEI"), which he started in 1986. BEI's business strategy was to acquire and rehabilitate financially distressed companies. It acquired all or nearly all the stock of six unprofitable companies, including The Entertainment and

---

[1]Mrs. Bell's separate appeal has been severed and is being held in abeyance while the Commissioner considers her request for relief under the recently enacted "innocent spouse" provisions of the Code. See 26 U.S.C. § 6015.

Leisure Corporation ("Telcor"), which in turn acquired four distressed theme parks. BEI also acquired one profitable business, the Kaufman Lumber Company.

Bell financed the effort to turn around these distressed companies by extending loans to BEI and Telcor, using proceeds from the sale of ENSCO stock and from substantial personal bank borrowings secured by additional ENSCO stock. The strategy was seriously disrupted by the stock market crash of October 1987, which drastically reduced the market value of Bell's remaining ENSCO stock. The resulting turmoil at ENSCO forced Bell to recommit his personal energies to that company. The drop in ENSCO's stock price lessened the value of the collateral for Bell's bank loans, and the banks pressured him for repayments. Meanwhile, the distressed BEI and Telcor subsidiaries were not turning around. Indeed, by late 1988 three of those companies had ceased operations. Bell faced an immediate cash crisis.

In preparing the Bells' joint 1988 tax return, their tax advisers calculated that $5,360,636 of Bell's loans to BEI and Telcor became worthless that year. Claiming that amount as a business bad debt deduction, the Bells obtained immediate hardship refunds in May 1989. The issue on appeal is whether the bad debt deduction was improper because the partially worthless loans in question did not relate to Bell's trade or business. "The question whether a debt is a nonbusiness debt is a question of fact." Treas. Reg. § 1.166-5(b). Thus, we review for clear error the Tax Court's determination that Bell's loans to BEI and Telcor were nonbusiness debts. See Millsap v. Commissioner, 387 F.2d 420, 422 (8th Cir. 1968). The taxpayer has the burden of proof on this issue. See Deely v. Commissioner, 73 T.C. 1081, 1092 (1980).

## II.

"[N]ot every income-producing and profit-making endeavor constitutes a trade or business. . . . [T]o be engaged in a trade or business, the taxpayer must be involved in the activity with continuity and regularity." Commissioner v. Groetzinger, 480 U.S.

23, 35 (1987). Bell received over $300,000 in salary from ENSCO in 1988. "[B]eing a salaried corporate executive may be a trade or business," Millsap, 387 F.2d at 422, but Bell does not argue that his loans to BEI and Telcor were in any way related to his work at ENSCO. Nor does Bell argue he was in the trade or business of making loans, as the taxpayer contended in Imel v. Commissioner, 61 T.C. 318, 323 (1973). Thus, the issue is whether the loans to BEI and TELCOR were related to a second trade or business that Bell started when he decided to disengage from ENSCO. See Katz v. Commissioner, 19 T.C.M. (CCH) 1035, 1043 (1960) (an individual may be engaged in more than one trade or business). This additional trade or business must be something other than devoting time and energy to his investments. "[I]nvesting is not a trade or business [because] the return to the taxpayer, though substantially the product of his services, legally arises not from his own trade or business but from that of the corporation." Whipple v. Commissioner, 373 U.S. 193, 202 (1963).

Bell argues that his loans to BEI and Telcor were related to the trade or business of "buying, rehabilitating and reselling corporations." Taxpayers have been litigating this theory for decades. Its governing parameters were defined by the Supreme Court in Whipple. In that case, the taxpayer sold his equity interests in twelve corporations in 1951 and formed eight new corporations. In 1951 and 1952, he acquired a bottling franchise and bottling equipment, constructed a bottling plant, and then sold the bottling equipment and leased the plant to one of his corporations. In 1952 and 1953, he made sizable cash advances to the corporation. The bottling business failed, and the taxpayer deducted the debt owed him by the corporation from his 1953 taxable income as a business bad debt. Resolving a conflict in the circuits, the nearly unanimous Court affirmed the Tax Court's determination that the taxpayer was *not* in the trade or business of "organizing, promoting, managing or financing corporations":

> Devoting one's time and energies to the affairs of a corporation is not of itself, and without more, a trade or business of the person so engaged. . . . Even if the taxpayer demonstrates an independent trade or

business of his own, care must be taken to distinguish bad debt losses arising from his own business and those actually arising from activities peculiar to an investor concerned with, and participating in, the conduct of the corporate business.

If full-time service to one corporation does not alone amount to a trade or business, which it does not, it is difficult to understand how the same service to many corporations would suffice. *To be sure, the presence of more than one corporation might lend support to a finding that the taxpayer was engaged in a regular course of promoting corporations for a fee or commission, or for a profit on their sale, but in such cases there is compensation other than the normal investor's return, income received directly for his own services rather than indirectly through the corporate enterprise . . . .* [S]ince the Tax Court found, and the petitioner does not dispute, that there was no intention here of developing the corporations as going businesses for sale to customers in the ordinary course, the case before us inexorably rests upon the claim that one who actively engages in serving his own corporations for the purpose of creating future income through those enterprises is in a trade or business. That argument is untenable . . . and we reject it.

373 U.S. at 202-03 (emphasis added; citations omitted). Bell argues he satisfies the Supreme Court's test in <u>Whipple</u> because he engaged in the trade of business of acquiring troubled companies, quickly rehabilitating them, and selling them for a profit greater than "the normal investor's return." Like the Tax Court, we disagree.

The biggest problem with Bell's theory is that he did not provide personal services to the distressed businesses for which he might expect compensation in addition to an investor's return. <u>Whipple</u> declared the general rule that investing is not a trade or business. The Court also recognized that promoting corporations can be a trade or business, and that some corporate promoters may be compensated for their personal services through the sale of the corporations being promoted. For this exception to apply, the sale must occur in a manner that confirms that the taxpayer's

profits were, in the words of <u>Whipple</u>, "received directly for his own services."  For example, "an early and profitable sale" of the corporation is evidence that the taxpayer held it for sale to customers in the ordinary course of the taxpayer's (rather than the corporation's) business.  <u>Townshend v. United States</u>, 384 F.2d 1008, 1012 (Ct. Cl. 1967); <u>see</u> <u>Deely</u>, 73 T.C. at 1093.  Bell did not actively manage BEI or its troubled subsidiaries.  Indeed, after the market crashed, Bell's personal energies were needed by ENSCO; his primary contribution to BEI's turnaround efforts was to provide working capital through loans to BEI and Telcor.  That is the role of an investor.

Second, Bell's theory fails to distinguish between his trade or business and that of BEI.  BEI was in the business of rehabilitating troubled corporations.  Though wholly owned by Bell, it was a separate taxpayer (in tax parlance, a Subchapter C corporation).  Bell's contribution was to invest in BEI and Telcor by making working capital loans.  As <u>Whipple</u> makes clear, investing in BEI was not a trade or business.

Third, Bell's theory suffers because BEI never successfully rehabilitated and sold any of the troubled companies.  Bell correctly notes that a trade or business need not succeed to be legitimate.  But Bell claims that the distressed corporations were "held in inventory" for prompt resale.  A sale out of inventory is taxed as ordinary income; investors usually prefer that their profits be taxed as capital gains.  Not surprisingly, therefore, Bell's contemporaneous financial records listed his interest in BEI as an investment, reflecting the normal investor's intent that any profits from BEI's turnaround activities would be taxed at the more favorable capital gains rate.  Thus, as initially structured and recorded by Bell, the formation of BEI, its acquisitions, and Bell's working capital loans bear the indicia of investor activities.[2]

_____

[2]This is no doubt why very few taxpayers assert they are in the trade or business of buying and selling corporations.  <u>See</u> 2 BORIS I. BITTKER & LAWRENCE LOKKEN, FEDERAL TAXATION OF INCOME, ESTATES AND GIFTS ¶ 33.6, at 33-23 (2d ed. 1990); <u>cf.</u> <u>United States v. Clark</u>, 358 F.2d 892, 895-96 (1st Cir. 1966).  When a corporate

Finally, as the Tax Court noted, BEI employees testified at trial that BEI's objective was to purchase companies and turn them around for resale *or* for retention as successful ongoing concerns. This testimony was inconsistent with Bell's theory. "It is the early resale which makes the profits income received directly for services, for the longer an interest is held, the more profit becomes attributable to the successful operation of the corporate business." Deely, 73 T.C. at 1093-94.

For the foregoing reasons, the Tax Court's finding that Bell's loans to BEI and Telcor were nonbusiness debts is not clearly erroneous. "The facts showed no more than a loss by an investor in a corporation resulting from a transaction entered into to bring profit to the corporation, and thereby to its stockholders." United States v. Byck, 325 F.2d 551, 555 (5th Cir. 1963). Accordingly, we affirm.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

promoter or rehabilitator claims that he took stock in a new or distressed corporation in lieu of a fee for his services, the stock becomes his inventory and its sale generates ordinary income, just as cash received for his services would have been ordinary income. Unless a taxpayer who claims to be in the trade or business of promoting or rehabilitating corporations is willing to treat his profits as ordinary income, he is not entitled to treat losses such as bad debts as ordinary losses. In our view, the few cases in which taxpayers have prevailed on this issue since Whipple are of questionable authority because they inexplicably ignored this aspect of the issue. See Farrington v. United States, 111 B.R. 342 (Bankr. N.D. Okla. 1990); Newman v. Commissioner, 56 T.C.M. (CCH) 1232 (1989); Farrar v. Commissioner, 55 T.C.M. (CCH) 1628 (1988).