WILLIAM R. KINNEY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3509-74.    Filed April 21, 1976.

William R. Kinney, pro se.
*Daniel J. Westerbeck,* for the respondent.

HALL, *Judge:* Respondent determined a deficiency of $1,312.90 in petitioner's 1972 income tax. The only issue for decision is whether section 212[1] permits petitioner to deduct certain travel expenses he incurred during 1972.

Some of the facts have been stipulated and are found accordingly.

Petitioner, William R. Kinney, resided in Ann Arbor, Mich., when he filed his petition. His sole occupation during the year at issue was that of investor in securities and commodities. During 1972, he maintained several stock brokerage accounts and a commodity brokerage account. In 1972 he bought and sold substantial blocks of stock in Allied Mills, Inc. (Allied), Stokely Van Camp, Southern Railway System, and American Motors Corp. (AMC).

---

[1] All section references are to the Internal Revenue Code of 1954, as in effect during the year in issue.

Petitioner became very familiar with the corporations in which he invested. He read relevant financial data, including annual reports, compiled weekly production charts, and clipped articles from newspapers about the corporations. As part of his investment method petitioner also visited corporate factories and retail outlet locations. As part of his on-site investigative technique, petitioner during 1972 made approximately 15 trips through parts of the United States and Europe.

On his 1972 return petitioner deducted expenses attributable to his investment study trips. Respondent agrees that petitioner actually spent $467.12 for hotels and $745.70 for items such as tolls and car storage. Petitioner also deducted $2,204.64 for auto expenses, calculated according to miles traveled.

From July 9 through July 20, 1972, petitioner visited Denver, Colo. The parties have agreed that the Denver trip is a fair representation of the scope and nature of all of petitioner's trips during 1972 and as such we will limit our discussion of the other trips to only a few brief background comments.

On the Denver trip petitioner visted AMC dealerships as well as Allied plants and Allied retail outlets. Prior to the trip petitioner had learned from reading the AMC annual report and from studying other relevant information that AMC considered strong dealerships crucial to its success in auto sales. AMC had approximately 1,900 dealerships at this time. As for Allied, while petitioner was aware of Allied's past record of corporate losses resulting from its poultry production, he noted that Allied had begun manufacturing and selling dogfood successfully. Allied had been selling its dogfood through feed mills, pet stores, and kennels. They hoped to start marketing it in grocery stores, where most dogfood is sold. Denver was selected as one of four test market areas for dogfood sales in grocery stores.

On July 9 [2] petitioner left Ann Arbor and drove to Chicago where he stayed with his aunt. On July 10 in Chicago, Ill., petitioner talked with a soybean meal buyer and a marketing manager for Allied. The half hour conversation with the soybean meal buyer was general conversation about Allied's business. In a shorter conversation with the marketing manager, petitioner discussed the success of Allied's dogfood marketing methods. On July 10 petitioner also visited an AMC Jeep dealership. While

---

[2] All dates are in 1972, unless otherwise stated.

there, petitioner discussed sales progress with one of the dealership's owners. Petitioner learned that for June 1972 sales of Jeeps in the Chicago area were up 59 percent.

Petitioner's mother and aunt accompanied him when he left Chicago on his trip to Denver. On July 11 petitioner visited the Wayne Feed Mill operated by Allied in Mendota, Ill. He took a plant tour and was satisfied with the operation. As petitioner traveled west, he visited Allied plant facilities in Elm Creek and Cozad, Nebr.

Petitioner arrived in Denver and stayed with his brother from July 12 to July 16. In Denver petitioner visited four AMC dealerships. While at each of the dealerships he talked with salesmen about the success of their respective operations. While in Denver petitioner also visited an Allied area food broker for Wayne dogfood. He was told that the company was having success with its introductory marketing offer. He visited several grocery stores, observing that Allied's dogfood lines were on the stores' shelves and were well located for easy access by customers.

Petitioner left Denver on July 16. On his return trip to Ann Arbor he visited several other AMC dealerships, again discussing sales. He also visited an Allied dogfood packing plant, a producer of swine stock for the Allied swine leasing program, and various Wayne feed retail outlets.

Most of petitioner's visits on the Denver trip regarding Allied and AMC lasted 15 to 45 minutes. They lasted longer, however, if he went on a plant tour. From his AMC visits, petitioner learned that the dealerships' personnel had great enthusiasm and that sales were increasing. From his Allied visits, petitioner confirmed that the dogfood line had sales potential. Petitioner's choice of specific plants and retail outlets to visit was made at random. With Allied he was aware that Denver was a test market area, but there was no pattern to Allied plants and retail outlets selected. Petitioner's AMC dealership choices depended more on the route chosen to Denver than on a selection based on dealership size, the models it stocked, or the population centers it serviced. Petitioner admitted that some of the time he spent visiting corporate facilities was wasted.

While on the Denver trip, petitioner learned that the Continental Grain Co. had made a tender offer to purchase a controlling interest in Allied. Petitioner felt that the tender offer would limit the small investor's opportunity to invest in Allied's

stock. He nevertheless continued with the trip. But he began to dispose of his stock in Allied immediately after his return from Denver, and by mid-November he had sold his entire 10,000 shares of Allied. Throughout 1972, including during his trip to Denver, petitioner purchased AMC stock.

Petitioner's other trips during the year also involved visits to plants and retail outlets of Allied and AMC as well as other corporations in which petitioner had invested or was interested in investing. On his three trips to Florida, totaling 81 days, he stayed with his mother in St. Cloud, Fla., for 60 days.[3] While in St. Cloud he frequently visited a brokerage house in Orlando.

On a trip which took him to Europe for a month petitioner made investment study stops as he drove to New York City. While in Europe he made several stops at AMC dealerships and at various grocery stores to investigate whether the Stokely Van Camp product line was on the shelf.

OPINION

Petitioner contends that the travel expenses he incurred in 1972 to make on-site investigations of plants and retail outlets of corporations in which he was buying and selling stock are deductible expenses under section 212. He asserts that the trips were one component in his overall investment technique, qualifying as ordinary and necessary expenses incurred either in the production of income or for the management, conservation, or maintenance or property held for the production of income.

Respondent contends that the trip expenditures were personal. He points to the large amounts of time petitioner spent with relatives on his trips. He also asserts that petitioner's expenditures did not meet the ordinary and necessary requirement of section 212. In addition respondent claims that petitioner failed to meet the substantiation requirements of section 274(d).

We conclude that petitioner has failed to prove that his traveling expenses were ordinary and necessary.

Section 212 provides in pertinent part that an individual can deduct "all the ordinary and necessary expenses paid or incurred during the taxable year (1) for the production or collection of income [and] (2) for the management, conservation, or maintenance of property held for the production of income."

---

[3] Petitioner's extended stay in Florida on one such trip resulted, in part, from his mother's illness.

Section 1.212-1(d), Income Tax Regs., provides that "Expenses, to be deductible under section 212, must be 'ordinary and necessary.' Thus, such expenses must be reasonable in amount and must bear a *reasonable and proximate relation* to the production or collection of taxable income or to the management, conservation, or maintenance of property held for the production of income." (Emphasis added.)

Petitioner during 1972 engaged in the purchase and sale of various publicly traded corporate stocks, including those of AMC and Allied. As part of his investment technique, petitioner read relevant financial information, visited his broker's office, compiled weekly production charts, clipped corporate-related news stories from periodicals for future reference, and conducted onsite investigations of both plants and retail outlets of corporations in whose stock he was investing.

One of his on-site investigative trips took him to Denver. On that trip he concentrated on visiting Allied and AMC facilities. Petitioner claims that he sought to investigate the success of a new Allied dogfood line that was being test-marketed in the Denver area. He also alleges that he investigated other facets of Allied production. In addition, during that trip, petitioner claims he visited AMC dealerships to get a firsthand look at their operations and gain insight into potential sales volume. But, regardless of petitioner's intent in making the trip, we are not convinced that the related expenses were customary or normal for an investor in stocks and commodities.

There is no indication in the record that the facilities visited were statistically significant. Nor is there any indication of their relative importance within the total corporate picture. None of the locations visited were noted as crucial in production or otherwise having some direct effect on stock market value. The AMC dealerships visited appeared to be selected at random. There appeared to be no pattern to Allied facilities visited apart from the fact that they were located on the way to or in Denver. Nor did petitioner establish that the trip had a direct effect on any particular stock transaction.

Petitioner has not proved that his travel expenses in 1972 were ordinary and necessary; they did not bear a reasonable and proximate relationship to his investment activities. They were similar to the travel expenses of the taxpayer in *Stanley S. Walters,* 28 T.C.M. 22, 38 P-H Memo. T.C. par. 69,005 (1969).

In that case the taxpayer sought to deduct expenses for trips he made during his lunch hour to various brokerage houses to observe the "ticker tape." Taxpayer claimed watching the "ticker tape" gave him a feel for the market, but he could not tie this activity to any specific stock transactions. This Court, in disallowing taxpayer's travel expenses on the grounds that they lacked the requisite proximate relationship to the income-producing activity, stated:

To a degree petitioner's actions impress us as smacking of personal interest, entertainment or curiosity. Thus, * * * we conclude that the trips were neither "ordinary" in the sense that they can be treated as normal or customary, nor "necessary" in the sense that they have been shown to be appropriate and helpful to petitioner in the production of income. The linchpin between the transportation expenses and the production of income is missing. In this context we regard such expenditures as too remote or too attenuated to be classified as "ordinary and necessary" expenses within the purview of section 212. * * * [*Stanley S. Walters,* 28 T.C.M. at 25, 38 P-H Memo. T.C. at p. 69-26 (1969).] See *John C. Kingsbury,* 34 T.C.M. 875, 879-880, 44 P-H Memo. T.C. par. 75,204, pp. 75-863, 75-864 (1975); Rev. Rul. 56-511, 1956-2 C.B. 170.

Circumstances could be imagined in which an investor's costs of travel to places of business of companies in which he holds stock might be ordinary and necessary, although petitioner cites us to no precedent in which such costs have been so allowed. If proof had been adduced that such a trip was part of a rationally planned, systematic investigation of the business operations of such a company, if the level of costs involved had been reasonable viewed in relation to the magnitude of the investment and the value of the information reasonably expected to be derived from the trip, if the circumstances had negated a disguised personal motive for the travel, and if there had been some showing of practical application through investment decisions of the kind of information gained from such trips, we might have been favorably disposed to petitioner's contentions. We need not, and do not, hold that as a matter of law the legitimate costs of travel by an investor to places of business of firms in which he holds a substantial stake may never be deducted. We hold merely that under the circumstances of this case, petitioner has not persuaded us that the costs he incurred were ordinary and necessary.

Having reached this conclusion, we need not and do not reach respondent's argument under section 274(d).

*Decision will be entered under Rule 155.*