WILLIAM M. and JANICE E. McCARTY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE
McCarty v. Commissioner
Docket No. 715-84.
United States Tax Court
T.C. Memo 1987-254; 1987 Tax Ct. Memo LEXIS 253; 53 T.C.M. (CCH) 854; T.C.M. (RIA) 87254; May 18, 1987; Amended May 20, 1987 Gerald N. Daffner, for the petitioners. Bradford A. Johnson, for the respondent. PARR
MEMORANDUM FINDINGS OF FACT AND OPINION PARR, Judge: Respondent determined deficiencies in petitioners' Federal income tax *255 as follows: Taxable Year
Deficiency
1978
$8,738.87
1979
9,994.78
1980
4,675.67
1981
3,757.00
1982
2,361.00
At trial, petitioners asserted overpayments resulting from travel expenses not deducted on either return incurred during 1978 and 1979. The issues for decision are (1) whether two sailboats petitioner [1] purchased qualify for the investment tax credit ("ITC") as section 38[2] property within the meaning of section 48(a), (2) whether their salvage values were correctly calculated, and (3) whether petitioners' travel expenses claimed for the taxable years 1978 through 1981 are deductible business expenses. FINDINGS OF FACT Petitioners resided in Troy, N.Y., at the time the petition was filed in this case. They timely filed their Federal income tax returns for the years 1978, 1979, 1980, 1981 and 1982 with the Internal Revenue Service Center, *256 Andover, Mass.
Petitioner practices ophthalmology in Troy. He first was exposed to sailing during his brief naval service as an apprentice seaman. At that time he learned to sail on a small, ten-foot dinghy. After establishing his medical practice petitioner again took up sailing. Having a lakefront summer home, he introduced his children to sailing a nine-foot Sunfish. He also took a power boating course at the same time. In 1969, petitioner purchased a 41-foot sloop from C.S.Y. Yacht Corporation (hereinafter sometimes referred to, collectively with its affiliates, as "CSY"). [3] Petitioner purchased the 41-foot sloop for $30,500 and immediately upon purchase leased it to CSY for seven years. In January of 1978, CSY sold the boat on behalf of petitioner for $29,000. The practice *257 of CSY was to lease the vessels to bareboat charter customers, i.e., individuals providing their own qualified sailor and who do not require the services of a skipper or a crew. The charter contracts which CSY provides mandate that the charterers shall not transport merchandise for pay or otherwise engage in any trade during the term of the charter. CSY provided its services in selling, leasing back and chartering boats as a package. Besides being advertised as a good investment, the CSY lease-back program was sold as an easy way to own and enjoy a yacht. On or about June 1, 1978, petitioner purchased from CSY for $72,000 a CSY 44 Cutter ("the Udjat"), a 44-foot yacht. One month earlier, on or about May 1, 1978, petitioner entered into an agreement to lease the Udjat for seven years to CSY. On or about August 1, 1979, petitioner purchased from CSY for $64,785 a CSY 33 Cutter (the "Bally Hi"), a 33-foot yacht. On or about September 27, 1979, petitioner entered into an agreement to lease the Bally Hi for seven years to CSY. Under the leases, CSY was to maintain the boats in the same condition as received, reasonable wear and tear excepted. The leases required CSY to pay for *258 all expenses during the period of lease, including maintenance, insurance, and replacement of equipment. Also under the leases, the boat owners were entitled to use their yacht or an equivalent yacht at any of the CSY marinas [4] free of charge [5] for up to four weeks each year. After each yacht was purchased, it was taken directly from its place of manufacture in Clearwater, Fla., to the location from which it would be initially chartered. The Udjat was chartered from St. Vincent, West Indies. The Bally Hi was chartered from Tortola, British Virgin Islands. CSY requests that the lessors with whom they deal acquire U.S. Coast Guard "documentation" for their boats and routinely handles this paper procedure for them. CSY acquired a "pleasure" license for each of petitioner's boats in the year it *259 was purchased. In computing depreciation on the boats, petitioner claimed a useful life of 15 years for each boat. In the years they were purchased, petitioner estimated salvage values of $12,000 for the Udjat and $11,000 for the Bally Hi. Petitioner did not have any personal experience in estimating salvage values for vessels nor did he have access to any type of commonly used guidebook for estimating salvage values for boats. Partially because high oil prices in 1978 and 1979 boosted prices for boat components and partially because of high inflation, industry expectations were that boats such as the Udjat and the Bally Hi would maintain their dollar value and perhaps appreciate in the short term. The rising cost of new boats kept the used boat market strong. In 1980, recessionary pressures, a decrease in the number of European tourists to North America because of the strong U.S. dollar, and falling oil prices caused a downturn in pleasure boat sales. As a result of this slump, CSY paid only 18 months of rent to petitioner. CSY gave him a promissory note for the balance due under the two lease agreements. [6]
*260 Each year from 1978 through 1981, petitioner made one trip to a CSY marina, except in 1979, when he made two. On these trips, petitioner intended to and did inquire about the condition of the boats at the marinas. He looked into the marinas' maintenance facilities and the general care that the boats were given. At each of the marinas, petitioner saw a chart listing each vessel in possession of the marina and indicating which weeks a vessel had been leased out and when it was due for repairs. Petitioner annually received a letter from CSY's principal, Mr. Van Ost, reporting this same information. During no trip did petitioner spend more than 3 hours examining his boats and discussing their condition with marina personnel. After each of his visits, petitioner wrote to Mr. Van Ost noting the condition of the boats and suggesting improvements. During 1978, petitioners and two companions traveled to St. Vincent, West Indies, for 10 days. During this trip, they sailed around the West Indies aboard the Udjat and enjoyed swimming and snorkeling. Petitioner also anchored where CSY lessees would likely anchor to see how the boats were treated. Petitioner testified that he incurred *261 expenses of $692.45 for food, drinks, a hotel room, and the boat charter fee, above and beyond the $863 in air fare deducted on the return for 1978. In June 1979, petitioners traveled to Tortola, British Virgin Islands, for eight days. During this trip, they sailed a CSY 33-foot Cutter. At this point, petitioner did not own a 33-foot boat and had no boat at the CSY marina in Tortola. After this trip, however, petitioner purchased the Bally Hi, which was chartered from Tortola. In December 1979, petitioners traveled again to Tortola for eight days and sailed a CSY 33-foot yacht. Petitioner spent approximately one and one-half hours on board inspecting the Bally Hi. It was his first viewing of the boat. On each of the two 1979 trips, petitioners engaged in the same recreational as well as investigative activities as they did in 1978. On their income tax return for 1979, petitioners deducted $1,938.00 for expenses relating to the June 1979 trip. Petitioner testified that air fare for the December 1979 trip totaled $653.92 for both himself and his wife and that this amount was not claimed on the return. In May 1980, petitioners and some friends traveled to Tortola for eight *262 days. They sailed two 44-foot boats and petitioner engaged in the same recreational and investigative activities as he had previously. During this trip, petitioner went aboard the Bally Hi, talked to the charterers about the Bally Hi for approximately 20 to 30 minutes, and had discussions with the marina personnel. In January 1981, petitioners and two friends traveled to the Bay Island, Roatan, Republic of Honduras, for seven days and engaged in the same types of activities as before. Petitioner did not have a boat in Honduras, however, and so did not on that trip examine any of his property. His trip to Honduras helped petitioner decide not to have CSY charter his boat from the CSY marina there. On their joint income tax returns for 1978 through 1982, petitioners claimed the following amounts for ITC, depreciation, and travel expenses relating to the Udjat and Bally Hi, all of which were disallowed by respondent: Investment
Year
Credit
Depreciation
Travel
Udjat
Bally Hi
Udjat
Bally Hi
1978
$7,200
$2,333
$863
1979
$6,500
4,000
$1,195
1,938
1980
4,000
3,586
1,758
1981
4,000
3,586
1,662
1982
4,000
3,586
*263 Petitioners claimed at trial they overpaid their tax because of an additional $692.45 travel expense deduction for their 1978 trip and an additional $653.92 travel expense deduction for their December 1979 trip, neither of which were claimed on their returns. OPINION Investment Tax Credit
Section 38 allows a taxpayer to claim a credit for investments in certain qualified property, designated in section 46(c) as "section 38 property." The term section 38 property is defined in section 48(a) and generally includes depreciable tangible personal property. However, if such property is used predominantly outside the United States, it ordinarily does not qualify as section 38 property. Sec. 48(a)(2)(A). Section 48(a)(2)(B) lists specific exceptions to this rule and section 48(a)(2)(B)(iii) excepts "any vessel documented under the laws of the United States which is operated in the foreign or domestic commerce of the United States * * *." Respondent maintains that petitioner's boats were not operated in the foreign or domestic commerce of the United States. [7] Petitioner maintains the *264 opposite. We hold for respondent on this issue. Foreign or domestic commerce of the United States is not precisely defined in the Internal Revenue Code or the Commissioner's regulations. The regulations do provide: A vessel [is] documented under the laws of the United States if it is registered, enrolled, or licensed under the laws of the United States by the Commandant, United States Coast Guard. Vessels operated in the foreign or domestic commerce of the United States include those documented for use in foreign trade, coastwide trade, or fisheries; * * *. Sec. 1.48-1(g)(2)(iii), Income Tax Regs.[8]
*265 Respondent argues, in effect, that the regulation's list of documented uses exhausts those which are operated in the foreign or domestic commerce of the United States. He then points us to the Title 46 definitions of the listed uses [9] and, observing that petitioner meets none of the definitions, concludes that petitioner does not meet the section 48(a)(2)(B)(iii) exception. We reject this reasoning on several grounds. First, the second prong of the regulation is expressly nonexhaustive. It states that vessels operated in the foreign or domestic commerce of the United Statesinclude those documented in a certain manner by the Coast Guard. Thus, a pleasure license documentation does not bar a vessel from being operated in the commerce of the United States. This is so even though there may be a prohibition *266 on pleasure-licensed vessels from transporting merchandise or carrying passengers for pay. [10]
Moreover, the operative words in the second part of the regulation, as in the second part of the statute, are "operated in" not "documented for" commerce in the United States. The focus is thus on the activities of, not the paperwork associated with the vessel. We believe this leaves room for a court to determine that a craft documented otherwise than for foreign trade, coastwise trade or fisheries under the Coast Guard's regime, is operated in commerce and meets the applicable requirement. [11]
*267 From the above, it is clear that the failure of petitioner's craft to meet one of the definitions of one of the enumerated documented uses is not fatal to petitioner's case. Likewise, the term in CSY's charter agreements prohibiting lessees from transporting goods for pay does not mandate a finding that the boats were not operated in commerce. We nevertheless hold that petitioner's vessels were not engaged in the foreign or domestic commerce of the United States. [12] We do so for the following reasons.
When section 48(a)(2)(B)(iii) is read in the context of the numerous other subdivisions of section 48(a)(2)(B), it is apparent that petitioner's boats should not be deemed to be operated in the foreign or domestic commerce of the United States. Section 48(a)(2)(B) lists and discusses ten exceptions to the general rule that *268 property used predominantly outside the United States does not qualify for the ITC. The first five exceptions deal with specific types of transportation property, i.e., property which is mobile and designed to carry passengers or goods. [13]
In four of these five exceptions, there is an explicit minimum requirement that the property be "operated to and from [or under contract with] the United States" (aircraft); be "used within and without the United States" (rolling stock); be "operated to and from the United States" (motor vehicles); or be "used in the transportation of property to and from the United States" (containers). [14]
We think, in the fifth such exception, the one at issue here, [15] the statutory references to "commerce of the United States" should be read to require a similar type of contact with United States ports. Specifically, for a vessel to be engaged in the commerce of the United States, it must, at a minimum, return to the United States with some *269 degree of frequency. [16]
*270 Petitioner's boats were shipped directly to the West Indies and to the British Virgin Islands by the manufacturer. There they have remained. They have been rented for pleasure use only from a CSY affiliate organized under the laws of the British Virgin Islands and doing business in Tortola and St. Vincent. They have been rented to tourists, only some of whom may have been American. There is no evidence that either boat has ever visited a United States port. The section 48(a)(2)(B) exceptions attempt to draw lines defining the minimum contact with the United States property must have to be section 38 property. In this case, not only are petitioner's boats used predominantly outside the United States, they are used entirely outside the United States. Ownership by a United States person and possible occasional charters to other United States persons are simply insufficient. We think, if anything, petitioner's sailboats were used in the tourist trade of the British Virgin Islands, and not in the foreign or domestic commerce of the United States. [17] We therefore hold for respondent on *271 this issue. Depreciation and Salvage Value
The second issue is whether petitioner is entitled to depreciation deductions for his boats. Section 167 provides for the allowance of a depreciation deduction for the exhaustion, wear and tear of property held for the production of income including a reasonable allowance for obsolescence. Section 1.167(a)-1(a), Income Tax Regs., provides: [t]he allowance is that amount which should be set aside for the taxable year in accordance with a reasonably consistent plan * * *, so that the aggregate of the amounts set aside, plus the salvage value, will, at the end of the estimated useful life of the depreciable property, equal the cost or other basis of the property as provided in section 167(g) and § 1.167(g)-1. * * * In order to take advantage of the deduction for depreciation during the years in issue, petitioner is required to first estimate what the salvage value of the property will be at the end of its useful life in the *272 business. See Massey Motors, Inc. v. United States,364 U.S. 92, 105 (1960); section 1.167(a)-1(g), Income Tax Regs.An asset may not be depreciated below its reasonable salvage value. Hertz Corp. v. United States,364 U.S. 122 (1960); section 1.167(a)-1(c), Income Tax Regs. Salvage value is defined as the amount (determined at the time of acquisition) which it is estimated will be realizable upon sale or other disposition of an asset when it is no longer useful in the taxpayer's trade or business or in the production of his income. Hibernia National Bank in New Orleans v. United States,740 F.2d 382, 386 (5th Cir. 1984); sec. 1.167(a)-1(c), Income Tax Regs. Once salvage value is determined, it shall not be changed merely because of unforeseeable changes in price levels. Fribourg Navigation Co. v. Commissioner,383 U.S. 272, 278-279 (1966); sec. 1.167(a)-1(c), Income Tax Regs.
Respondent may require *273 a redetermination of salvage value when it becomes apparent that such value has been miscalculated. See Fribourg v. United States,383 U.S. 272, 277 (1966). [18] Petitioner has the burden to prove respondent's determination is erroneous. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Petitioner has failed to carry his burden of proof. Respondent contends that the salvage values of the Udjat and the Bally Hi were equal to their purchase prices and, therefore, petitioner is not entitled to depreciation deductions. Petitioner, on the other hand, estimated salvage values of $12,000 and $11,000 for the Udjat and the Bally Hi, respectively. Petitioner testified that he and his accountant arrived at these figures based on a "worst case scenario" of what the boats would be worth after the seven year lease periods when petitioner would sell the boats. There is no indication in the record that petitioner's accountant had any experience in estimating salvage values for boats. Petitioner's experience with valuing sailing vessels was limited to the purchase of the *274 two sailboats in issue plus a 41-foot sloop which he sold just prior to purchasing the Udjat. That boat was purchased in 1969 for $30,500 and sold in 1978 for $29,000. The boat had been under lease to CSY for seven years of petitioner's ownership. During the years in which the vessels were purchased and the salvage values established, the general expectation in the yachting industry was that values would stay constant or appreciate. Through April 1980, selling prices of new yachts were escalating rapidly and used boats were selling for close to their purchase prices. Further, five months before petitioner purchased the Udjat he sold his first boat for over 95 percent of its purchase price after having leased it for seven years. Petitioner bought the Bally Hi a year after the Udjat. These facts are evidence that petitioner knew CSY was properly discharging its obligation under the leases to maintain the boats, and that, therefore, he should have expected to recoup an amount close to his purchase price when he sold the boats. [19] Petitioner has failed to introduce contrary evidence sufficient to support his position. However, petitioner has the right to reduce salvage value *275 by up to 10 percent of his cost basis. Sec. 167(f). [20] Except to that extent, we hold for respondent on this issue. Travel Expenses
We next address the travel expenses petitioner has claimed for "inspecting" his boats. Ordinary and necessary expenses incurred for the production or collection of income or for the management, conservation or maintenance of property held for the production of income are deductible under section 212. [21]
Section 1.212-1(d), Income Tax Regs., provides: *276 Expenses, to be deductible under section 212, must be "ordinary and necessary." Thus, such expenses must be reasonable in amount and must bear a reasonable and proximate relation to the production or collection of taxable income or to the management, conservation, or maintenance of property held for the production of income. We may apply this regulation by examining: (1) whether petitioner had a dominant personal motive for these trips; (2) whether the costs were ordinary and necessary expenses paid for the purposes provided in section 212; and (3) whether the trips bore a reasonable and proximate relation to the production of income or management of income-producing property. See Kinney v. Commissioner,66 T.C. 122 (1976). In the instant case, petitioner purchased the Udjat in June 1978 and it was taken directly from its place of manufacture to St. Vincent, West Indies, from whence it would be chartered. Petitioner saw the Udjat for the first time soon after its purchase, when he flew to St. Vincent and sailed the Udjat with his wife and friends. Petitioner's trip lasted ten days and he spent the majority of his time enjoying recreational water activities *277 with his wife and two friends. We accept petitioner's testimony that it was important for him to physically inspect his recent investment, ascertain the conditions of the marina where he would leave his new investment and discuss the boat's condition with the marina personnel. However, each year petitioner received a letter from Mr. Van Ost outlining information about the boats' condition. We do not believe inspection was petitioner's primary motive for his trip. We think, instead, that his primary purpose was recreational. His expenses are not deductible. Travel expenses of a taxpayer's spouse accompanying him on a business trip are not ordinary and necessary unless it can be adequately shown that the spouse's presence on the trip has a bona fide business purpose. Silverman v. Commissioner,28 T.C. 1061, 1064 (1957), affd. 253 F.2d 849 (8th Cir. 1958); sec. 162-2(c), Income Tax Regs. Petitioner was the sole owner and lessor of his boats and we see no reason to allow expenses of his wife's travel when we deny his. In June 1979 petitioners flew to Tortola *278 and sailed a CSY 33-foot sailboat. They spent this trip enjoying recreational water activities. Petitioner did not then own a boat in Tortola. [22] After the trip, however, petitioner decided to purchase a CSY 33-foot sailboat and lease it to CSY in Tortola. A taxpayer may not deduct under section 212 expenses related to a search for a new business venture or an attempt to obtain income by the creation of a new property interest. Dean v. Commissioner,56 T.C. 895 (1971); Frank v. Commissioner,20 T.C. 511 (1953). At the time of their trip, petitioners did not own any property in Tortola. Petitioners are not entitled to deduct any expenses related to their June 1979 trip. In December 1979 petitioners again flew to Tortola, where the Bally Hi was then docked. *279 Petitioner spent approximately one and a half hours conducting a walk-through inspection of his new investment. He also spent some time talking to the marina personnel. Petitioners spent the remaining part of their trip sailing and enjoying recreational water activities. Again, we acknowledge a colorable business purpose in petitioner's desire to see his new boat but we cannot on this record conclude that this was the primary motivation of his trip. Expenses for petitioner's 1980 trip are disallowed for the same reasons we disallowed the expenses of the 1978 trip. Expenses for petitioner's 1981 trip are disallowed for the same reasons we disallowed the expenses of the June 1979 trip. A predominant part of petitioner's time during all his trips was sailing and enjoying recreational water activities. Petitioner was not required by CSY to use any personal efforts in the maintenance or management of his boats. His oversight functions may have been real, but they were not mandated by any dereliction by CSY. We cannot find they were the predominant motive for his trips. The primary or dominant purpose of each of his trips was to take a sailing vacation and, therefore, was personal *280 in nature. [23] "Inspecting" his boats was merely secondary and incidental to his purpose. Expenses related to petitioner's trips are nondeductible personal expenditures. To reflect the foregoing, Decision will be entered under rule 155.
Footnotes
1. For convenience, petitioner-husband William M. McCarty will hereinafter be referred to as petitioner. ↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. There are three corporations involved here. CSY Yacht Corporation of Tampa, Fla., is the manufacturer of the boats. Carribean Sailing Yachts, Ltd., Tortola, British Virgin Islands is the lessee and charterer of the boats. CSY, Inc., of Tenafly, New Jersey, serves as a sales agent for the Tampa corporation. Hereinafter, each of these three corporations will sometimes be referred to as "CSY."↩
4. CSY has maintained marinas at Marathon, Florida; Tortola, British Virgin Islands; Roaton, Honduras; and St. Vincent, West Indies. Apparently, the CSY marina in Marathon, Florida was closed before petitioner purchased the Udjat. ↩
5. Petitioners had to pay for their own food, drink, mooring charges, anchoraging charges and a nominal charter fee each time they chartered a boat.↩
6. It is unclear whether payment was made for 18 months use of one, or both boats. Our decision would not be changed in either case.↩
7. Respondent does not argue that petitioner's boats failed to satisfy the first criterion of the two-pronged test enumerated in sec. 48(a)(2)(B)(iii)↩, i.e., that they be documented under the laws of the United States.
8. Documentation is the administrative procedure by which a vessel is registered or licensed as a vessel of the United States for identification purposes and certified as authorized to engage in a specific trade. See 46 USC § 12104 (1982). However, craft such as petitioner's, which are licensed as pleasure vessels, were not "allowed to transport merchandise or carry passengers for pay." 46 U.S.C. sec. 102 (1976)↩.
9. Respondent cites 46 U.S.C. sec. 1244 (1982) for the definition of foreign trade, 46 C.F.R. sec. 67.17-5 for the definition of coastwise trade, and 46 C.F.R. 67.17-9↩ for the definition of fisheries.
10. See 46 U.S.C. secs. 103, 107 (1976), now replaced by 46 U.S.C. sec. 12109 (1982)↩.
11. Respondent relies on 46 U.S.C. sec. 12110 (1982)↩ to reason that a vessel may not be employed in a trade except a trade covered by the certificate of documentation issued for that vessel. Although violation of the rule stated may give rise to sanctions under Title 46, we do not think that dispositive of our inquiry under Title 26. The operated in commerce requirement is separate and distinct from the documentation requirement.
12. On virtually identical facts, we held a taxpayer entitled to the ITC in Dickson v. Commissioner,T.C. Memo. 1983-723↩. In that case, however, we did not discuss the issue under consideration here, inasmuch as it was not raised by respondent.
13. See sec. 48(a)(2)(B)(i), (ii), (iii), (iv), (v)↩.
14. The relevant regulatory language contains similar or more restrictive requirements. See sec. 1.48-1(g)(2)(i), (ii), (iv), (v), Income Tax Regs.↩
15. Sec. 48(a)(2)(B)(iii)↩. 16. We are aware that the opposite conclusion might be reached if our analysis were made in a vacuum. That is, we could interpret the absence from sec. 46(a)(2)(B)(iii) of language specifically requiring contact with United States territory as indicating Congressional intention that no such contact by vessels be necessary. We have previously observed, however, that the ITC foreign property exception under consideration here "was intended to promote capital investment in vessels that play an integral and productive role in the nation's economy (e.g., the United States merchant marine)" and that "the use of petitioner's sailboats for charter in the British Virgin Islands cannot in any way be viewed as contributing to the productivity of the United States economy." Kelley v. Commissioner,T.C. Memo. 1982-728. As in Kelley, we find support for our analysis in the legislative history of the investment credit, where the Senate Finance Committee stated: The objective of the investment credit is to encourage modernization and expansion of the Nation's productive facilities and thereby improve the economic potential of the country, with a resultant increase in job opportunities and betterment of our competitive position in the world economy. * * * [S. Rept. No. 1881, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 707↩, 717.]
17. See Kelley v. Commissioner,T.C. Memo. 1982-728↩.
18. See also Dickson v. Commissioner,T.C. Memo. 1983-723↩.
19. With the decline in the yachting industry, CSY has also not been able to keep the maintenance of the boats in good condition. Petitioner has testified that after leasing the Udjat to CSY for seven years, he would need to invest $15,000 in repairs to this boat before it could be sold at a good price. However, these after the fact events are not pertinent to determinations made in the year of acquisition.↩
20. See Dickman v. Commissioner,T.C. Memo. 1983-723↩.
21. Respondent does not argue that petitioner did not have a profit objective with respect to his boat investments.↩
22. The parties have stipulated that the Udjat was at times located in both the West Indies and the British Virgin Islands. That the Udjat might have been in Tortola, British Virgin Islands, would not change our result, however. See the discussion above relating to the 1978 trip expenses.↩
23. See Kinney v. Commissioner,66 T.C. 122 (1976) (shareholder's travel expenses to corporate sites nondeductible); Holmes v. Commissioner,T.C. Memo. 1983-442 (trips to inspect rental properties predominantly personal in nature); and Harley v. Commissioner,T.C. Memo. 1969-226↩ (expenses of looking at investment property not proximately related to the management of the property).