T.C. Memo. 1999-427


UNITED STATES TAX COURT


WILLIAM J. FLEISCHAKER AND DONNI L. FLEISCHAKER, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 6668-97.                    Filed December 30, 1999.


<u>Joseph W. Martin</u> and <u>Frank H. McGregor III</u>, for
petitioners.

<u>C. Glenn McLoughlin</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


MARVEL, <u>Judge</u>:    Respondent determined deficiencies in
petitioners' Federal income tax of $101,342 for 1991 and $22,513

for 1992 and accuracy-related penalties under section 6662(a)[1] of $20,268 for 1991 and $4,503 for 1992.

After concessions by the parties,[2] the issues for decision are:

1.  Whether petitioners may deduct: (a) Loan guaranty payments of $18,329 paid in 1991 and $98,000 paid in 1992 as business bad debts under section 166, and (b) legal fees (incurred in defending against enforcement of the loan guaranties) of $213,239 paid in 1991 and $45,636 paid in 1992 as ordinary and necessary business expenses under section 162;[3] and

2.  whether petitioners are liable for the accuracy-related penalties under section 6662 for 1991 and 1992.

---

[1]Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the years in issue and Rule references are to the Tax Court Rules of Practice and Procedure.

[2]Petitioners concede that they had unreported interest income of $947 for 1991 and $1,337 for 1992.  Petitioners further concede that they are not entitled to Schedule C deductions (1) in 1991 of $9,171 for travel, $1,598 for meals, $2,619 for supplies, $4,228 for double deductions, and $2,976 for interest, and (2) in 1992 of $4,675 for interest.  With respect to disallowed travel and entertainment expenses reported by petitioners on Schedule C for 1991, respondent concedes that petitioners are entitled to deduct $2,002 as employee expenses and $579 as sec. 212 expenses on Schedule A for 1991.  Respondent also agrees that $11,149 of the legal and professional expenses for 1992 are deductible under sec. 162 on petitioners' Schedule C - Medical.

[3]Petitioners concede that none of the legal fees paid prior to 1991 are deductible in 1991 or 1992.  Respondent concedes that the legal fees and related expenses paid in 1991 and 1992 are deductible in those years but only as miscellaneous itemized deductions under sec. 165(c)(2) or 212.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

Petitioners resided in Phoenix, Arizona, when they filed their petition. Hereinafter, references to petitioner are to William J. Fleischaker.

Petitioner's Medical Education and Training

Petitioner attended the University of Oklahoma College of Medicine (the medical school), located in Oklahoma City, Oklahoma. He graduated as a doctor of medicine in June 1979 and was licensed to practice medicine by the Oklahoma Board of Medical Licensure on July 1, 1980.

After graduating from medical school, petitioner began a 3-year family practice internship/residency program at the medical school. He worked 80 to 120 hours per week as an intern in the program from July 1, 1979, to June 30, 1980, at which time he took a 2-year leave of absence. From June 1980 to July 1982, petitioner was employed by a group of physicians that staffed two emergency clinics in Tulsa, Oklahoma. He worked approximately 20 hours per week at the two clinics and occasionally worked weekends at two other emergency rooms.

Petitioner resumed his participation in the medical school's family practice residency program on July 1, 1982, and completed

the program on June 30, 1984.  During the residency, he worked 40 to 80 hours per week.

In July 1984, after completing his residency, petitioner worked 40 hours per week at the Eastern Oklahoma Sports Medicine Center in Tulsa.  Petitioner became board certified in family practice in 1985.  After leaving the Eastern Oklahoma Sports Medicine Center in 1985, petitioner worked 40 hours per week at the Glass-Nelson Occupational Clinic in Tulsa until he moved to Phoenix, Arizona, in May 1987.

Adult Living Centers, Inc.

During his second year of medical school, petitioner had learned that, by the time he became 50 years old, 50 percent of the population of the United States would be 50 years of age or older.  Petitioner decided to specialize in family medicine because he recognized an opportunity to develop an administrative type of medical practice and to promote new concepts in care for the elderly.

While working as an emergency room physician during his 2-year leave of absence from the residency program, petitioner began developing his concept for an integrated nursing care facility and looking for investors.  Petitioner and three other individuals, Charles Wetz, John Wetz, and Jerry Colclazier (hereinafter collectively referred to as petitioner's associates), were interested in the nursing home business.  By

1980, petitioner and his associates formed Adult Living Centers, Inc. (Adult Living Centers), to own and operate a proposed new facility in Muskogee, Oklahoma, known as the Van Orden Memorial Adult Living Center (the Van Orden project). Petitioner invested approximately $25,000 in the stock of Adult Living Centers and was a member of the board of directors and vice president of the corporation. None of the individuals, however, had experience in constructing or operating a nursing home facility. Charles Wetz had a degree in hospital administration. Mr. Colclazier was to manage the construction of the Van Orden project.

Petitioner and his associates did not intend the Van Orden project to be a typical nursing home facility. Instead, they envisioned a multifunctional comprehensive facility that would provide traditional long-term care, integrate intermediate care with day care for the elderly, integrate day-care service for children with day care for older individuals, and provide residences for seniors. Petitioner had the idea of integrating adult day care with intermediate care because it would be more beneficial to the patients and more economical. Petitioner also thought that integrating child care with senior care would provide a nurturing interaction for the children with grandparent type figures during the day and would stimulate the elderly (because of the interaction with the children).

Petitioner viewed the Van Orden facility as a prototype for developing other multifunctional care facilities in the United States. His goal was to own similar facilities throughout the country, possibly through a nationwide chain. Petitioner intended to establish similar facilities in other States using different corporations that would be kept under his control.

While working as an emergency room physician during his 2-year leave of absence from the residency program, petitioner worked with architects, visited other senior service facilities, and participated in applying for the certificate of need. Petitioner also located land for the site of the proposed facility, negotiated the purchase, and financed the purchase of the land.[4]

Oklahoma required a proposed operator of a new nursing home facility to obtain a certificate of need from the Oklahoma Health Planning Authority (the planning authority). A certificate of need was required to ensure that there was a need for the facility in the local service area and to ensure that the proposed owner had adequate financial backing and experience to operate the facility successfully. Upon completion of the facility, the operator also needed to obtain a license from the Oklahoma State Department of Health.

---

[4]Petitioner was later repaid the purchase price of the land.

If the planning authority issued a certificate of need, the proponent had 6 months to submit a construction plan for the facility. Once the planning authority reviewed and approved the plan, construction was required to commence within 2 months after the approval of the plan and had to be completed within 1 year after the approval of the plan. Failure to meet these deadlines would result in forfeiture of the certificate of need.

In 1980, Adult Living Centers submitted an application to the planning authority for a certificate of need for the Van Orden project. The application requested approval for construction of a new 90-bed multifunctional facility in Muskogee with an estimated construction cost of $1,092,455. Petitioner was listed on the application (and introduced at the planning authority's hearing on the certificate of need) as the proposed medical director for the facility.

The project did not have any commitments from lenders at the time the application was submitted, but the application indicated that petitioner's family members were the principal interested investors in the project. The application included a letter from petitioner stating that his family had reviewed the Van Orden proposal and was interested in the investment opportunity. The application also included a letter from Liberty National Bank and Trust Co. of Oklahoma City verifying that petitioner's family had financial resources available for an investment in the Van Orden

project and vouching for the family's business and personal reputation.

The planning authority issued a certificate of need for the Van Orden project on December 17, 1980. After several plan submissions, the planning authority approved the construction plan on March 15, 1982. The certificate of need required construction on the Van Orden project to commence by May 15, 1982, and to be completed by March 15, 1983. Adult Living Centers had difficulty obtaining financing for the Van Orden project and obtained a 6-month extension to September 15, 1983, for the construction completion date.

As of February 1983, the Van Orden project still had no construction or permanent financing for the project. A planning authority inspection report, dated February 18, 1983, stated that no foundations had been poured for the project, and only preliminary site work had been performed for the project.

In the spring of 1983, Adult Living Centers' shareholders, with the assistance of Phoenix Federal Savings & Loan Association (Phoenix Federal), arranged a financing package for the Van Orden project. Under the financing package, Phoenix Federal's subsidiary, Eastern Oklahoma Service Corp. (Eastern Oklahoma), acquired 51 percent of Adult Living Centers' stock. Petitioner's stock interest was reduced from 48 percent to less than 20

percent. As a result, Eastern Oklahoma had voting control of Adult Living Centers.

Phoenix Federal arranged for a $3,150,000 loan from State Federal Savings & Loan Association (State Federal) to finance the construction of the Van Orden project. A tax-exempt bond facility provided funding for the loan. Phoenix Federal also arranged for a takeout commitment from State Federal. The takeout commitment provided that, subject to certain conditions, State Federal would provide funding to pay off the tax-exempt bond facility in the event of a mandatory bond redemption or upon final maturity of the bond issue.

At the March 17, 1983, closing of the State Federal loan, a dispute arose as to whether Adult Living Centers' shareholders, including petitioner, were required to guarantee the loans made to Adult Living Centers. Although petitioner stated his objections, he did sign a guaranty of collection for a proportionate amount of the $3,150,000 State Federal loan (State Federal loan guaranty) and a guaranty of payment for a proportionate amount of the commitment fee required by the State Federal takeout commitment (State Federal takeout guaranty). The amounts petitioner guaranteed were based on his proportionate stock ownership in Adult Living Centers.

Several competing nursing home operators objected to the Van Orden project and closely monitored the project. In May 1983,

the competitors sought to have the planning authority revoke the certificate of need because Adult Living Centers failed to begin construction within 2 months of the construction plan approval. The planning authority initially revoked the certificate of need but reinstated the certificate on June 23, 1983. The competing operators immediately challenged the planning authority's reinstatement of the certificate. Although Adult Living Centers ultimately prevailed in the litigation, the lawsuit absorbed some of the resources available for the Van Orden project and created uncertainty as to the project's eventual completion.

The State Federal loan enabled Adult Living Centers to complete construction of the Van Orden project by September 15, 1983. Adult Living Centers filed an Application for License to Conduct a Skilled Nursing Home Intermediate Care Facility or Rest Home/Personal Care Facility (license application), dated September 12, 1983, with the Oklahoma State Department of Health. The Oklahoma State Department of Health issued Adult Living Centers a 4-month probationary license to operate the Van Orden facility effective September 15, 1983. Charles Wetz was named as the administrator on the license application. Attached to the application was a certificate (licensed physician certificate) signed by petitioner that stated:

> I, William J. Fleischaker, MD, a duly licensed
> physician in the State of Oklahoma, agree to be called

for medical care emergencies and to act in an advisory capacity for the Van Orden Adult Living Center.

Although petitioner signed the physician certificate attached to the Van Orden facility's initial license application, he never provided and never intended to provide patient care at the facility.  Petitioner never received any compensation from Adult Living Centers as an officer, director, employee, or independent contractor.

After the probationary period, the Oklahoma State Department of Health issued Adult Living Centers annual licenses to operate the Van Orden facility beginning in January 1984.  The copy of the application for the license effective January 14, 1984, to January 13, 1985, does not have a  licensed physician certificate attached.

The license applications dated October 3, 1984, October 1, 1985, and October 3, 1986, filed with the Oklahoma State Department of Health to operate the Van Orden facility from January 14, 1985, to January 31, 1988, listed Charles Wetz as the administrator.  Petitioner was not the physician who signed the licensed physician certificates attached to the applications.

In addition to the nursing care facility, Adult Living Centers was building a child care center as part of the Van Orden project.  The Van Orden project continued to have construction cost overruns and operating deficits.  By the summer of 1984, the

directors of Adult Living Centers had become dissatisfied with Mr. Colclazier's management of the construction projects. Mr. Colclazier wanted to leave the project and sell his Adult Living Centers stock. He also wanted to be released from his loan guaranty obligations to State Federal, which required State Federal's approval.

The directors of Adult Living Centers arranged for the corporation to purchase Mr. Colclazier's stock. State Federal agreed to release Mr. Colclazier from the guaranty obligations provided the remaining shareholders executed a substitute guaranty agreement. On July 25, 1984, State Federal, Eastern Oklahoma, petitioner, and Charles Wetz executed a release of guaranty extinguishing Mr. Colclazier's obligations to State Federal. On July 27, 1984, Eastern Oklahoma, petitioner, and Charles Wetz executed a substitute guaranty with respect to the State Federal loan and the takeout commitment (State Federal substitute guaranty).

During this time, in an attempt to meet the additional cost overrun and operating deficit, Adult Living Centers obtained a $600,000 loan commitment from Phoenix Federal in the summer of 1984. Adult Living Centers, however, was unable to meet all the requirements of the written loan commitment, and, on July 11, 1984, Phoenix Federal notified Adult Living Centers that it would not advance any funds under the loan commitment.

On July 31, 1984, petitioner borrowed $206,040 from Phoenix Federal and then lent the money to Adult Living Centers to help meet the cash requirements. The promissory note evidencing Phoenix Federal's loan to petitioner was secured by petitioner's stock in Adult Living Centers. The note was due on December 31, 1984.

On October 15, 1984, Phoenix Federal provided a $700,000 line of credit to Adult Living Centers to help cover cost overruns and operating deficits. Petitioner executed a limited guaranty of collection on a portion of the line of credit (Phoenix Federal line of credit guaranty) based on his proportionate stock ownership interest in Adult Living Centers. Adult Living Centers used funds borrowed on the line of credit to repay petitioner the $206,040 he had lent to the corporation. Petitioner then repaid his $206,040 loan from Phoenix Federal.

In 1985, Phoenix Federal sold its controlling interest in Adult Living Centers to William Ricketts, a Muskogee businessman. Mr. Ricketts and the other principals in Adult Living Centers determined they needed additional cash-flow in order to salvage the Van Orden project. Mr. Ricketts thought an additional nursing home facility would provide enough excess cash-flow to service the Van Orden project debts and provide administrative cost savings.

Adult Living Centers negotiated to purchase Muskogee Convalescent, an existing licensed nursing home facility located in Muskogee, Oklahoma. To finance the purchase, Adult Living Centers obtained an $855,000 loan from Phoenix Federal on September 11, 1985. Petitioner signed a limited guaranty of payment for a portion of the new $855,000 Phoenix Federal loan (Phoenix Federal loan guaranty) based on his proportionate stock ownership in Adult Living Centers.

Despite the acquisition of Muskogee Convalescent, however, Adult Living Centers continued to have financial difficulties and defaulted on its various obligations to State Federal and Phoenix Federal. The lending institutions, or their respective successors in interest,[5] commenced collection actions and foreclosure proceedings against Adult Living Centers to collect the outstanding debts and against petitioner to enforce his obligations under the various guaranty agreements.[6] Between 1988 and 1992, petitioner was a party to five separate lawsuits pertaining to the Phoenix Federal and State Federal loans and commitments to Adult Living Centers.

---

[5]Cimarron Federal Savings & Loan Association (Cimarron Federal) was a successor in interest to Phoenix Federal. The Resolution Trust Corporation (RTC) was a successor in interest to Cimarron Federal and to State Federal.

[6]In certain instances, the Federal Deposit Insurance Corporation (FDIC) supervised the collection of loans owned by RTC.

The first action, <u>Fleischaker v. State Fed. Sav. & Loan Association</u>, Case No. 88-C-1230-E (the Fleischaker/State Federal case), was a declaratory judgment action filed by petitioner in the U.S. District Court for the Northern District of Oklahoma on September 12, 1988. The Fleischaker/State Federal case pertained to petitioner's State Federal loan guaranty, State Federal takeout guaranty, and State Federal substitute guaranty.

By order dated October 11, 1990, the Federal District Court determined that the State Federal loan guaranty required the bank to proceed first against Adult Living Centers before proceeding against petitioner. The court further found that the bank's failure to do so was a material breach of the agreement, thereby releasing petitioner from his obligations under the State Federal loan and substitute guaranties. The court, however, found that petitioner was liable for his share of commitment fees under the State Federal takeout guaranty. On November 19, 1990, a judgment in the amount of $18,329.06 was entered against petitioner in the Fleischaker/State Federal case. On February 5, 1991, the parties in the Fleischaker/State Federal case filed a mutual release and satisfaction of judgment, reflecting that petitioner had fully satisfied the $18,329.06 judgment.

From 1987 to 1991, petitioner paid the following legal fees in the Fleischaker/State Federal case:

| Year | Attorney's fees |
|------|-----------------|
| 1987 | $2,735 |
| 1988 | 16,227 |
| 1989 | 67,754 |
| 1990 | 17,643 |
| 1991 | 23,581 |

The second action, State Fed. Sav. & Loan Association v. Adult Living Ctrs., Case No. CJ-88-6322 (the State Federal/Adult Living Centers case), also pertained to petitioner's State Federal loan guaranty, State Federal takeout guaranty, and State Federal substitute guaranty. The State Federal/Adult Living Centers case was a collection action filed by State Federal in the District Court of Tulsa County, Oklahoma, on October 21, 1988. On February 5, 1991, the claims against petitioner in the State Federal/Adult Living Centers case were dismissed with prejudice.

From 1989 to 1991, petitioner paid the following legal fees in the State Federal/Adult Living Centers case:

| Year | Attorney's fees |
|------|-----------------|
| 1989 | $8,963 |
| 1990 | 29,932 |
| 1991 | 3,128 |

The third action was brought in 1989 by Cimarron Federal pertaining to petitioner's obligations under the Phoenix Federal line of credit guaranty. That case, Cimarron Fed. Sav. & Loan Association v. Adult Living Ctrs., Case No. C-89-1402 (the 1989

Cimarron Federal/Adult Living Centers case), was a collection and foreclosure action filed by Cimarron Federal on September 11, 1989, in the District Court of Muskogee County, Oklahoma.

From 1989 to 1992, petitioner paid the following legal fees in the 1989 Cimarron Federal/Adult Living Centers case:

| Year | Attorney's fees |
|------|-----------------|
| 1989 | $2,770 |
| 1990 | 5,144 |
| 1991 | 17,561 |
| 1992 | 31,449 |

The fourth and fifth actions were brought by Cimarron Federal pertaining to petitioner's obligations under the Phoenix Federal loan guaranty. The fourth action, Cimarron Fed. Sav. & Loan Association v. Adult Living Ctrs., Case No. C-90-62 (the 1990 Cimarron Federal/Adult Living Centers case), was filed by Cimarron Federal on January 23, 1990, in the District Court of Muskogee County, Oklahoma. The fifth action, Cimarron Fed. Sav. & Loan Association v. Fleischaker, Case No. CIV 90-522-S (the Cimarron Federal/Fleischaker case), was filed on October 16, 1990, in the U.S. District Court for the Eastern District of Oklahoma.

On December 18, 1991, petitioner paid $98,000 to RTC to settle the Cimarron Federal/Fleischaker case. Under the settlement document, petitioner was released from claims raised against him in the Cimarron Federal/Fleischaker case and the 1990

Cimarron Federal/Adult Living Centers case. The settlement, however, did not release petitioner from claims raised in the 1989 Cimarron Federal/Adult Living Centers case. The record in this case does not disclose the resolution of the 1989 Cimarron Federal/Adult Living Centers case.

From 1990 to 1992, petitioner paid the following legal fees in the 1990 Cimarron Federal/Adult Living Centers case:

| Year | Attorney's fees |
|------|-----------------|
| 1990 | $19,114 |
| 1991 | 1,131 |
| 1992 | 98 |

From 1990 to 1992, petitioner paid the following legal fees in the Cimarron Federal/Fleischaker case:

| Year | Attorney's fees |
|------|-----------------|
| 1990 | $4,069 |
| 1991 | 167,838 |
| 1992 | 14,089 |

In 1991, Petitioner also incurred and paid $3,293 in travel expenses associated with his attempts to settle the Cimarron Federal/Fleischaker case.

Petitioners' 1991 and 1992 Federal Income Tax Returns

Petitioners timely filed joint individual Federal income tax returns for 1991 and 1992, reporting no tax for 1991 and total tax of $53,464 for 1992. The return for each year contained two Schedules C, Profit or Loss From Business, for which petitioner was identified as the sole proprietor. One business was

identified as "William J. Fleischaker, M.D." for which the principal business was the provision of medical services. The other business was identified as "Deborah Fleischaker, et. al" for which the principal business was oil and gas production. On the Schedules C for oil and gas production activity, petitioners claimed legal and professional expenses of $439,871 for 1991 and $51,950 for 1992. None of the claimed legal and professional expenses were related to the oil and gas production activity. Except for $11,149 of the fees claimed in 1992, the fees claimed as legal and professional fees from oil and gas production were for payments made by petitioner under his guaranty obligations for Adult Living Center debts and legal fees incurred in defending against those obligations. The remaining $11,149 claimed in 1992 was related to petitioner's medical services activity.

In the notice of deficiency, respondent disallowed a deduction for all $439,871 of legal fees claimed on the 1991 return and $40,801 of the fees claimed in 1992. Respondent did not disallow the $11,149 of fees claimed as a deduction related to gas and oil production in 1992 that were related to petitioner's medical services activity.

OPINION

Issue 1.  Whether petitioners may deduct loan guaranty payments and related legal fees under sections 166 and 162

Respondent contends that petitioner's payments in settlement of his obligations under the various guaranties are deductible as nonbusiness bad debts, and the attorney's fees paid by petitioner in defending against actions to enforce the guaranties are deductible as miscellaneous expenses under section 212 or 165 (c)(2) rather than as ordinary and necessary business expenses. Petitioners contend the guaranty payments are deductible as business bad debts under section 166, and the attorney's fees are deductible as ordinary and necessary business expenses under section 162.

A taxpayer may deduct debts that become worthless in the taxable year.  See sec. 166(a)(1).  Section 166 distinguishes between business and nonbusiness bad debts.  Nonbusiness bad debts of taxpayers other than corporations are short-term capital losses.  See sec. 166(d)(1)(B).  A nonbusiness debt is a debt other than "(A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer, or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business."  Sec. 166(d)(2).  "The crucial part in the definition of nonbusiness bad debts are the words, 'trade or business.'"  Deely v. Commissioner, 73 T.C. 1081, 1092

(1980).  To qualify as a business bad debt, the debt must bear a proximate relation to the taxpayer's trade or business.  See sec. 1.166-5(b), Income Tax Regs.; see also United States v. Generes, 405 U.S. 93, 103 (1972); Deely v. Commissioner, supra at 1092.

Payments made to discharge an obligation as a guarantor generally are deductible under section 166 as business bad debts if (a) the taxpayer was engaged in a trade or business when he made the guaranty, and (b) the guaranty was proximately related to the conduct of that trade or business.  See Scofield v. Commissioner, T.C. Memo. 1997-547; Jones v. Commissioner, T.C. Memo. 1997-368; Weber v. Commissioner, T.C. Memo. 1994-341; sec. 1.166-9, Income Tax Regs.

A taxpayer may deduct ordinary and necessary expenses paid or incurred in carrying on a trade or business.  See sec. 162(a). A taxpayer may deduct legal expenses under section 162 if the origin of the claims with respect to which the expenses were incurred relates to the trade or business of the taxpayer.  See Woodward v. Commissioner, 397 U.S. 572, 577-578 (1970); Commissioner v. Tellier, 383 U.S. 687, 689 (1966); United States v. Gilmore, 372 U.S. 39 (1963).

Although the standards for deductibility under sections 166 and 162 are articulated differently, they share at least one common feature.  Under both sections, a taxpayer must establish that he had a trade or business to which the payment in question

related.  We turn, therefore, to an examination of whether petitioner's involvement with Adult Living Centers qualified as a trade or business within the meaning of either section 166 or 162.

In Whipple v. Commissioner, 373 U.S. 193 (1963), the Supreme Court held that the taxpayer's advances to one of a number of corporations he owned did not result in business bad debts, because the advances were not sufficiently related to the taxpayer's trade or business (as opposed to the trade or business of the taxpayer's corporation).  In Whipple v. Commissioner, supra at 202, the Supreme Court stated:

> Devoting one's time and energies to the affairs of a corporation is not of itself, and without more, a trade or business of the person so engaged.  Though such activities may produce income, profit or gain in the form of dividends or enhancement in the value of an investment, this return is distinctive to the process of investing and is generated by the successful operation of the corporation's business as distinguished from the trade or business of the taxpayer himself.  When the only return is that of an investor, the taxpayer has not satisfied his burden of demonstrating that he is engaged in a trade or business since investing is not a trade or business and the return to the taxpayer, though substantially the product of his services, legally arises not from his own trade or business but from that of the corporation. Even if the taxpayer demonstrates an independent trade or business of his own, care must be taken to distinguish bad debt losses arising from his own business and those actually arising from activities peculiar to an investor concerned with, and participating in, the conduct of the corporate business.

In this case, although petitioner devoted time and energy to the affairs of Adult Living Centers, Whipple confirms that such efforts of the taxpayer do not constitute a trade or business of the taxpayer when there is no intention of developing the corporation as a going business for sale in the ordinary course. Although a taxpayer's activities on behalf of the corporation in which he owns stock may create income or gain, the income or gain is more closely related to the successful operation of the corporation's business than that of the taxpayer. See id. A taxpayer who actively engages in serving his own corporation for the purpose of creating future income through the corporation is not in a trade or business. See id. at 202.

Petitioner's activities in this case are qualitatively different from those of a taxpayer who develops and sells businesses for profit. Developing and selling businesses for profit is a trade or business. However, the separate trade or business of promoting businesses "must be conducted for a fee or commission or with the immediate purpose of selling the corporations at a profit in the ordinary course of that business." Deely v. Commissioner, 73 T.C. 1081, 1093 (1980). Buying and selling businesses for profit may constitute a trade or business even though a promoter does not receive a fee, commission, or other "noninvestor" compensation. The promoter, however, "must show that the entities were organized with a view

to a quick and profitable sale after each business had become established, rather than with a view to long-range investment gains." Id. at 1093 (citing Giblin v. Commissioner, 227 F.2d 692 (5th Cir. 1955)).

In Deely, we found that the taxpayer was not in the trade or business of developing and promoting businesses. In Deely, the taxpayer quickly abandoned or sold 11 unprofitable companies. Of 16 profitable companies, he held 7 for more than 13 years, and an additional 6 entities sold for profit were held from 17 to 39 years. See id. at 1094.

In Farrar v. Commissioner, T.C. Memo. 1988-385, we found that the taxpayer was in the trade or business of developing and promoting businesses. In the Farrar case, the taxpayer bought and sold at least 31 banks and insurance companies, as well as other businesses and income-producing real estate. He trained local managers and contemplated selling the businesses to the local managers as the businesses became viable. For each of the three businesses involved in the Farrar case, the taxpayer had a plan aimed at earning a profit through the sale of the business; he did not acquire or hold the businesses as long-term investments.

In this case, petitioner was not working for a fee or commission and did not organize Adult Living Centers with a view to a quick and profitable sale after the business of the

corporation had become established. Petitioner guaranteed Adult Living Centers' loans so that the corporation could build its facilities and cover operating expenses. He intended to profit from his long-term stock ownership in the corporation. Petitioner hoped to profit from owning multiple nursing home facilities throughout the country using different corporations under his control. Petitioner intended to keep control of the corporations. He did not organize Adult Living Centers or intend to organize other future corporations with a view to a quick and profitable sale after each business had become established. See Millsap v. Commissioner, 46 T.C. 751 (1966), affd. 387 F.2d 420 (8th Cir. 1968); see also Smith v. Commissioner, 62 T.C. 263 (1974); Schwartz v. Commissioner, T.C. Memo. 1964-247; cf. Farrar v. Commissioner, supra.

We find that petitioner was not in the trade or business of developing, promoting, and selling businesses. Thus, petitioner may not deduct as a business bad debt the payments attributable to the discharge of his guaranties and may not deduct as ordinary and necessary business expenses the legal fees incurred in defending against enforcement of those guaranties.

Issue 2. Whether petitioners are liable for the accuracy-related penalties under section 6662 for 1991 and 1992

Respondent determined that petitioners are liable for accuracy-related penalties under section 6662(a) and (b)(2) for

1991 and 1992. Section 6662(a) and (b)(2) imposes a penalty equal to 20 percent of the portion of an underpayment of income tax attributable to any substantial understatement of tax. A substantial understatement occurs when the amount of the understatement exceeds the greater of 10 percent of the amount of tax required to be shown on the return or $5,000 ($10,000 for corporations). See sec. 6662(d)(1). The amount of an understatement against which the penalty is imposed will be reduced by the portion of the understatement that is attributable to the tax treatment of an item (1) that was supported by "substantial authority" or (2) for which the relevant facts were "adequately disclosed in the return or in a statement attached to the return." Sec. 6662(d)(2)(B). Additionally, no penalty will be imposed with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and the taxpayer acted in good faith with respect to such portion. See sec. 6664(c)(1).

Substantial authority exists when the weight of authority supporting the treatment of an item is substantial as compared to the weight of authority for the contrary treatment. See sec. 1.6662-4(d)(3)(i), Income Tax Regs. In determining whether there is substantial authority, all authorities relevant to the tax treatment of an item, including those authorities pointing to a contrary result, are taken into account. See id. For this

purpose, authorities include statutory and regulatory provisions, legislative history, administrative interpretations of the Commissioner, and court decisions, but not conclusions reached in treatises or legal periodicals. See Booth v. Commissioner, 108 T.C. 524, 578 (1997); sec. 1.6662-4(d)(3)(iii), Income Tax Regs.

Petitioners' position is not supported by any well-reasoned construction of the relevant statutory provisions. The cases petitioners have cited on brief are readily distinguishable and, to the extent they are pertinent, undermine their position. Cases that are factually distinguishable are not substantial authority. See Antonides v. Commissioner, 91 T.C. 686, 702-703 (1988), affd. 893 F.2d 656 (4th Cir. 1990); see also Estate of Reinke v. Commissioner, 46 F.3d 760, 765 (8th Cir. 1995), affg. T.C. Memo. 1993-197. We have rejected the factual basis of petitioners' claim, and, thus, the authority they cite is not relevant to the facts of this case and cannot constitute substantial authority.

Petitioners assert that they adequately disclosed the tax treatment of the attorney's fees and guaranties. The adequate disclosure requirement can be satisfied by providing information that "reasonably may be expected to apprise the Internal Revenue Service of the identity of the item, its amount, and the nature of the potential controversy". Sec. 1.6661-4(b)(3), Income Tax Regs.; see also Cramer v. Commissioner, 101 T.C. 225, 255 (1993),

affd. 64 F.3d 1406 (9th Cir. 1995). The regulations authorize two types of disclosure under section 6662(b)(2): (1) Disclosure in attachments to the return, see sec. 1.6662- 4(f)(1), Income Tax Regs., and (2) disclosure on the return, see sec. 1.6662-4(f)(2), Income Tax Regs. Petitioners did not file any separate disclosure statement; therefore, they must demonstrate that they adequately disclosed all relevant information on their tax returns.

Petitioners assert that they adequately disclosed the items at issue on their 1991 and 1992 returns. The return for each year contained two Schedules C for businesses for which petitioner was identified as the sole proprietor, one for "William J. Fleischaker, M.D." for which the principal business was the provision of medical services and another for "Deborah Fleischaker, et al." for which the principal business was oil and gas production. On the Schedules C for petitioner's oil and gas production for 1991 and 1992, petitioner claimed legal and professional expenses of $439,871 for 1991 and $51,950 for 1992. None of the claimed legal and professional expenses were related to petitioner's oil and gas production activity. Except for $11,149 of the fees claimed in 1992, the fees claimed as legal and professional fees from oil and gas production were for payments made by petitioner under his guaranty obligations for

Adult Living Centers' debts and legal fees incurred in defending against those obligations.

The Commissioner, by annual revenue procedure (or otherwise), may prescribe the circumstances under which disclosure of information on a return in accordance with applicable forms and instructions is adequate. See sec. 1.6662-4(f)(2), (5), Income Tax Regs. The Commissioner issued Rev. Proc. 92-23, 1992-1 C.B. 737, applicable to 1991 returns, and Rev. Proc. 93-33, 1993-2 C.B. 470, which extended the application of Rev. Proc. 92-23, 1992-1 C.B. 737, to 1992 returns. The revenue procedures identify circumstances under which the disclosure on a taxpayer's return of a position with respect to an item is adequate disclosure for purposes of reducing the understatement of income tax under section 6662.[7]

---

[7]Rev. Proc. 92-23, 1992-1 C.B. 737, 738, provides in part:

Additional disclosure of facts relevant to, or positions taken with respect to, issues involving any of the items set forth below is unnecessary for purposes of reducing any understatement of income tax under section 6662(d) of the Code provided that the forms and attachments are completed in a clear manner and in accordance with their instructions. The money amounts entered on the forms must be verifiable, and the information on the return must be disclosed in the manner described below. For purposes of this revenue procedure, a number is verifiable if, on audit, the taxpayer can demonstrate the origin of the number (even if that number is not ultimately accepted by the Internal Revenue Service) and the taxpayer can show good faith in entering that number on the applicable
(continued...)

The procedures require the taxpayer to complete the forms and attachments in a clear manner and in accordance with their instructions.  See Rev. Proc. 92-23, 1992-1 C.B. 738.  The instructions for the Schedules C require a taxpayer to complete separate schedules for each business of the taxpayer.  See Instructions for Schedule C, Profit or Loss from Business, for 1991 and 1992.

Petitioners filed two Schedules C for each of the years at issue, one for petitioner's oil and gas production activity and another for petitioner's medical services practice.  Petitioner does not contend that either activity included petitioner's activity with regard to Adult Living Centers or the development of facilities for the elderly.  Petitioners did not complete a

---

[7](...continued)
form.

*       *       *       *       *       *       *

(b) Certain Trade or Business Expenses (which, for purposes of this revenue procedure, include the following six expenses as they relate to the rental of property):

*       *       *       *       *       *       *

(2)  Legal Expenses:  The amount claimed must be stated.  This revenue procedure does not apply, however, to amounts properly characterized as capital expenditures or personal expenses, including amounts that are required to be (or that are) amortized over a period of years.

(3)  Specific Bad Debt Charge-off:  The amount written off must be stated.

Schedule C for petitioner's activity related to Adult Living Centers. Instead, petitioners claimed the deductions at issue on Schedules C for the oil and gas production activity. Petitioners deducted the payments of petitioner's guaranties as legal and professional fees. It is clear that petitioner did not make a good-faith effort in entering the amounts of the claimed expenses on the Schedules C. Petitioners did not comply with the revenue procedures, and, therefore, the safe harbor provided by the revenue procedures does not apply.

A taxpayer may also satisfy the requirements for adequate disclosure by providing sufficient information on the face of the return that enables the Commissioner to identify the potential controversy. See Schirmer v. Commissioner, 89 T.C. 277, 285-286 (1987); Hernandez v. Commissioner, T.C. Memo. 1998-46; Elliott v. Commissioner, T.C. Memo. 1997-294, affd. without published opinion 149 F.3d 1187 (8th Cir. 1998); Horwich v. Commissioner, T.C. Memo. 1991-465. This method of disclosure requires more than a production of a "clue" with respect to the nature of the controversy. See Horwich v. Commissioner, supra.

Petitioners' disclosure was unquestionably inadequate given the disparity between the claim they were asserting and the facts. Their method of reporting the expenses disguised rather than disclosed the true substance of the payments. The mere declaration of a deduction does not entitle a taxpayer to a

reduced penalty for understatement of tax.  See Accardo v. Commissioner, 942 F.2d 444, 453 (7th Cir. 1991), affg. 94 T.C. 96 (1990) (taxpayer's statement that his deduction of $207,000 was for "Legal fees re conservation of property held for production of income" falls short of the exposition of relevant facts required under section 6661(b)(2)(B)(ii)); Schirmer v. Commissioner, supra at 285-286 (mere listing of income, expenses and claimed depreciation did not constitute disclosure of relevant facts); see also Zdun v. Commissioner, T.C. Memo. 1998-296 ("Reporting income actually earned as a dentist as income earned from an apple orchard is misrepresentation, not disclosure."); Lester v. Commissioner, T.C. Memo. 1995-317 (Taxpayers' use of the term "Financial Trading" in the title portion of their Schedule C was not sufficient to frame the controversy or to adequately disclose their position.); Myers v. Commissioner, T.C. Memo. 1994-529 (Even if "COMMODITIES" was adequate disclosure for deductions on Schedule C, the commodity contract losses were deducted on Schedule F, which is completely unrelated to petitioners' "disclosure" on Schedule C.)

Petitioners did not attach any disclosure statement to their return, and they did not provide sufficient information for respondent to identify the potential controversy on their return. To the extent the Rule 155 computation indicates a substantial understatement of petitioners' income tax within the meaning of

section 6662(d) for 1991 or 1992, respondent's determination under section 6662(a) will be sustained.

To reflect the foregoing and concessions by the parties,

<u>Decision will be entered under Rule 155</u>.